1  BARRY J. PORTMAN
   Federal Public Defender
2  ANGELA M. HANSEN
   Assistant Federal Public Defender
3  555 - 12th Street, Suite 650
   Oakland, CA 94607-3627
4  Telephone: (510) 637-3500

5  Counsel for ERIC BORGERSON

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR-07-0472 CW |
| | ) | |
| Plaintiff, | ) | MOTION, NOTICE OF MOTION AND |
| | ) | MEMORANDUM IN SUPPORT OF |
| vs. | ) | MOTION TO SUPPRESS AND REQUEST |
| | ) | FOR EVIDENTIARY HEARING |
| ERIC BORGERSON, | ) | |
| | ) | Date: May 14, 2008 |
| Defendant. | ) | Time: 2:30 p.m. |
| _____ | ) | Court: Honorable Claudia Wilken |

TO: UNITED STATES OF AMERICA, PLAINTIFF; AND JOSEPH RUSSONIELLO, UNITED STATES ATTORNEY; AND MERRY JEAN CHAN, ASSISTANT UNITED STATES ATTORNEY

PLEASE TAKE NOTICE that counsel for defendant Eric Borgerson hereby moves this Court for an order suppressing all fruits of the warrantless search of his computer.

The motion is based on this notice and motion, the following memorandum of points and authorities, the Fourth Amendment to the United States Constitution and all other applicable constitutional, statutory and case authority, and such evidence and argument as may be presented at the hearing and evidentiary hearing of this motion.

/ /

/ /

BORGERSON, CR 07-0472 CW
MOTION TO SUPPRESS                    1

**INTRODUCTION**

Employees of the University of California, Berkeley ["UCB"] searched and seized Mr. Borgerson's laptop computer without a warrant. Based on information obtained from the unlawful warrantless search, UCB police sought and obtained a warrant to search Mr. Borgerson's home, his office and his person. Pursuant to this warrant, they seized and searched, among other things, computers, cameras and CDs. UCB police also sought and obtained a warrant to conduct a further search of Mr. Borgerson's laptop computer that previously had been searched and seized without a warrant.

The initial warrantless search and seizure of Mr. Borgerson's laptop computer violated the Fourth Amendment. The subsequent seizures and searches pursuant to the warrants, as well as Mr. Borgerson's statements to the police, were based on evidence obtained during this initial warrantless search. Accordingly, the Court must suppress all fruits of the warrantless search and seizure of Mr. Borgerson's laptop computer.[1]

**FACTS**

**A. The warrantless search and seizure of Mr. Borgerson's work-issued laptop computer**

At the time of the conduct charged in the indictment in this case, Mr. Borgerson was an employee of the University of California Institute of Industrial Relations ["IIR"],[2] a department

---

[1] The Federal Public Defender recently reassigned Mr. Borgerson's case to new counsel. New counsel has reviewed the paper discovery produced thus far and believes that there is outstanding discovery and will soon ask the government to disclose additional forensic reports and other information to the defense. Mr. Borgerson therefore reserves the right to amend this motion to suppress based on evidence that has not yet been disclosed. For example, on April 15, 2008, shortly before new counsel was assigned this case, Mr. Borgerson asked the government to produce a listing of all the directories and file names on each of the hard drives seized. Mr. Borgerson agreed to file this opening motion without this information but may need to request additional time to file a reply brief once this or other discovery is produced.

[2] Although IIR is now known as the Institute for Research on Labor and Employment, Exhibit A, Bates 96, it will be referred to throughout this memorandum as "IIR."

BORGERSON, CR 07-0472 CW
MOTION TO SUPPRESS                            2

1  of UCB. Trained and licensed in California as an attorney, he drafted and edited articles for
2  CALIFORNIA PUBLIC EMPLOYEE RELATIONS, a bi-monthly periodical on public-sector labor and
3  employment law. Mr. Borgerson's office was located in the IIR building, a UCB-owned building
4  on Channing Way in Berkeley, California. He was paid by the university. *See* Eric Borgerson
5  Declaration ¶¶ 1-2.[3]

6  According to the discovery, the investigation of Mr. Borgerson began on Saturday,
7  October 28, 2006, when Robert Hiramoto, an information technology manager (also known as a
8  system security administrator) for the IIR, received a report indicating high bandwidth use on IIR
9  computers on Friday, October 27, 2006. Exhibit B, Bates 16. Specifically, the report indicated
10 that "a large amount of data" had been transferred over a port identified as "gtela." Exhibit C,
11 Bates 18. Based on the high-bandwidth report, Hiramoto "believe[d] that a user's computer was
12 running a file sharing program, and that a large amount of data was being received and sent to
13 and from this user's machine." Exhibit C, Bates 18.

14 The report indicated that 156 megabytes of traffic was associated with the "gtela" port.[4]
15 Exhibit D, Bates 216. This is not a particularly significant amount of data, especially in a
16 university setting. *See* Declaration of Jeff Michael Fischbach ¶ 7.[5] In fact, the same report
17 identified at least two other users ("hosts") who had transferred substantially *greater* amounts of

---

19  [3] Mr. Borgerson's declaration was filed simultaneous with this motion.

20  [4] On the bandwidth report, each horizontal line provides information for a separate port in
21  use. A "port" is a "mechanism that facilitates systems administrators to allow or disallow certain
    kinds of data to enter or exit the network." *See* Fischbach Decl. ¶ 7. The far right column,
22  labeled "T-O," indicates the amount of traffic, or bandwidth, for that port. In the T-O column,
    bandwidth is measured in kilobytes ["K"] or megabytes ["M"]. One megabyte equals
23  approximately 1,000 kilobytes. For comparison purposes, a compact disc holds approximately
    640 to 700 megabytes and a classic iPod can hold up to 80 gigabytes, which is equivalent to
24  80,000 megabytes. *Id.* Thus, the "large amount of data" Hiramoto identified was approximately
    1/6th the amount of the data that a CD can hold or 1/500th of the data that an iPod can hold. *Id.*
25  at ¶ 8.

26  [5] Mr. Fischbach's declaration was filed simultaneous with this motion.

data. Exhibit D, Bates 216 (one IIR port has 1550 megabytes of traffic associated with the user and another has 251 megabytes of traffic.). There is no indication in the discovery that these other two users were later targeted for search and seizure.

Hiramoto recognized that the "gtela" port "is normally associated with the 'gnutella' file transfer program." Exhibit C, Bates 18; *see also* Fischbach Decl. ¶ 8 ("'Gtla' is an abbreviation for the 'Gnutella' file-sharing program."] "Gnutella" is one of many peer-to-peer file-sharing programs, which are applications that allow computers to share files across the Internet without the aid of a server or other intermediary device. With peer-to-peer file-sharing, users can swap files with one another directly from each other's systems. *See* Fischbach Decl. ¶ 5. Although Hiramoto said that IIR computer users "do not run file sharing programs as part of their normal work," such programs have legitimate uses (as well as illegitimate ones), especially for the research and education communities.[6] *Id.* UCB does not have a policy prohibiting file sharing.[7] And in fact, the bandwidth report identified at least two other IIR users with activity in ports known to be associated with file-sharing. Exhibit D, Bates 220 (one IIR host has port identified as "kazaa," another file-sharing program (*see* Fischbach Decl. ¶ 5)); Exhibit D, Bates 227 (two IIR users have ports identified as "gtela"). There is no indication in the discovery that these other two users were later targeted for search and seizure.

---

[6] *See, e.g.*, Peer-to-Peer Applications, *available at* http://p2p.internet2.edu/apps_list.html (listing applications of peer-to-peer, or file-sharing, applications), attached as Exhibit E.

[7] *See, e.g.*, Jack McCredie, *Online music, entertainment, and software copyright issues, available at* 2005/digitalcopyright.html (October 14, 2004, open letter from UCB Chief Information Officer Jack McCredie emailed to all UCB students encouraging them to obey copyright laws and to "learn about the functionality of file sharing programs"), attached as Exhibit F; Karen Eft, *Q: So, can I use file-sharing programs or not?, available at* http://istpub.berkeley.edu:4201/bcc/Fall2002/pol. filesharing.html (Fall 2002 publication of Berkeley Computing and Communications discussing appropriate use of file-sharing and stating that "while file-sharing programs can be very valuable tools for bona fide campus activities, users must be aware of the appropriateness of the use and the impact on campus network resources."), attached as Exhibit G.

BORGERSON, CR 07-0472 CW
MOTION TO SUPPRESS                4

1    Hiramoto determined that the data connection transferring 156 megabytes of traffic (the
2 so-called "large amount of data") was associated with the static IP address for Mr. Borgerson's
3 UCB-issued work laptop computer.  Exhibit C, Bates 18; *see also* Exhibit H, Bates 144
4 ("Borgerson's laptop computer . . . had an assigned internet jack he was to use in his office.").
5 Once Hiramoto identified, from the bandwidth report, the port through which the "large amount
6 of data" was being transferred and the IP address for the computer using that port, he could have
7 closed the port entirely or restricted the amount of bandwidth allocated to the associated device.
8 This would have decreased or prevented any further file transfers.  Another remedy would have
9 been to immediately suspend Mr. Borgerson's user account or to disrupt network service to his
10 device.  *See* Fischbach Decl. ¶ 11.  Either of these steps would have allayed any concern
11 Hiramoto may have had about threats to the integrity or security of the system.[8]  *Id.*  In fact, if
12 Hiramoto legitimately had been concerned about a virus or other threats to the system,
13 disconnecting Mr. Borgerson's computer from the network would have been the fastest and most
14 effective way to contain any threat.  Remotely accessing Mr. Borgerson's laptop computer, as
15 Hiramoto did, would not have told him whether the network security or integrity of the system
16 had been compromised.  *Id*.

17    Hiramoto did not take steps to stop what he had identified as questionable computer
18 activity, however.  Nor did he try to contact Mr. Borgerson to ask about the high bandwidth
19 usage.  Instead, Hiramoto took a drastic measure:  without Mr. Borgerson's consent or
20 authorization, and without notifying Mr. Borgerson of his intent to do so, he remotely connected
21 to and viewed *and altered* the contents of Mr. Borgerson's laptop computer.  Exhibit C, Bates

---

[8]According to the defense expert, file-sharing can pose two types of threats to the integrity or security of a computer network:  (1) so much data could be downloaded at one time that it could congest the network, preventing or hampering other devices from utilizing the network; or (2) viruses could enter a network through file-sharing.  The bandwidth report that Hiramoto relied on here does not indicate the first kind of threat.  Moreover, file-sharing poses no more risk of introducing a virus to a network than does using email.  *See* Fischbach Decl ¶ 9.

BORGERSON, CR 07-0472 CW
MOTION TO SUPPRESS                  5

18-19. Hiramoto recalled only one other time, in the more than two years that he had worked for IIR, that he had "accessed an [IIR] employee work computer to investigate unusual activity," also prompted by a high-bandwidth report. Exhibit A, Bates 97.

Exactly what Hiramoto saw and did when he remotely accessed Mr. Borgerson's laptop is not entirely clear, because the discovery includes several different – and conflicting – accounts of his search. For example, in his first statement, to UCB police on October 29, 2006, Hiramoto said that when he logged in to Mr. Borgerson's laptop, he saw "several video file icons . . . with 'inappropriate, adult sounding names," and he gave an example. It is unclear from this account exactly where on the computer he "saw" these video file icons. Exhibit B, Bates 16. In a typewritten statement a few hours later on the same day, however, Hiramoto said that he "cannot remember what those file names were" but then identified them as having been "on the desktop." Exhibit C, Bates18-19. In both these initial accounts, Hiramoto said that he logged into Mr. Borgerson's laptop computer to confirm that a file-sharing program was causing the high bandwidth usage. Exhibit B, Bates 16; Exhibit C, Bates18. Notably, it was not until an FBI interview six months later that Hiramoto claimed that he needed to remotely access Borgerson's computer because he "initially thought the building's computer network had been compromised." Exhibit A, Bates 98.

When Hiramoto remotely accessed Mr. Borgerson's laptop, "he saw that the BearShare program had been installed. Hiramoto knows that BearShare is a file sharing program that allows others to access or share files." Exhibit A, Bates 98; *see also* Exhibit C, Bates 19 (Hiramoto noticed that "'BearShare' a well-known file sharing program" had been installed on Borgerson's laptop.). Once he had confirmed that there was a file-sharing program on Mr. Borgerson's laptop computer, Hiramoto did not remotely shut down Mr. Borgerson's laptop, as he had the power to do. Exhibit C, Bates 19; Exhibit A, Bates 98. Instead, Hiramoto continued searching Mr. Borgerson's laptop computer.

The BearShare program was not running when Hiramoto accessed Mr. Borgerson's

BORGERSON, CR 07-0472 CW
MOTION TO SUPPRESS                                    6

1  computer. Hiramoto launched the program. He "decided to run" it to view the files being
2  downloaded. Exhibit C, Bates 19. After launching BearShare, Hiramoto explored at least one
3  file to see where it was stored, he opened a directory and subdirectory and examined video file
4  thumbnails. Exhibit C, Bates 19; *see also* Exhibit A, Bates 98 (Hiramoto "accessed additional
5  files" after he "opened the BearShare program [and] saw a list of files waiting to be downloaded
6  that contained subject titles relating to child pornography."). It was only at this point that
7  Hiramoto shut down Mr. Borgerson's laptop computer. *Id.* Hiramoto then waited approximately
8  24 hours before he called UCB network security, which then called the UCB police department.
9  Exhibit C, Bates 19.
10         On October 29, 2006, Hiramoto met with a UCB police officer and showed him digital
11 "images he saved" from Mr. Borgerson's laptop computer. Exhibit B, Bates 16. At the officer's
12 request, Hiramoto printed out the digital images. Hiramoto then took the officer to Mr.
13 Borgerson's laptop computer, which had been moved to a different, locked, office. Exhibit A,
14 Bates 98. The UCB officer seized "for evidence" the laptop computer and a power cable and
15 digital media card with card reader that had not been issued by UCB. Exhibit B, Bates 17. The
16 following day, a UCB police detective reviewed the print-outs of the digital images and in two of
17 them saw an "obvious child" engaged in sexual conduct. Exhibit I, Bates 25.
18         Also on October 30, 2006, a UCB police officer asked Mr. Borgerson to come to the
19 police station to discuss an alleged security problem on his computer. Exhibit J, Bates 28. When
20 questioned about child pornography found on his laptop computer, Mr. Borgerson made
21 incriminating statements. Exhibit I, Bates 25-27. Mr. Borgerson was arrested by local authorities
22 and then later released on bond. After his release, Mr. Borgerson immediately entered
23 psychological counseling and has continued counseling to this day. He also entered a six-week
24 intensive treatment program to combat a serious methamphetamine addiction and has
25 successfully continued treatment. *See* Eric Borgerson Decl. ¶ 3.
26

BORGERSON, CR 07-0472 CW
MOTION TO SUPPRESS                          7

**B.    The subsequent warrant searches and seizures**

On October 30, 2006 – two days after the initial warrantless search – a UCB police detective sought and obtained a state search warrant to search Mr. Borgerson's home, his office and his person. Exhibit K, Bates 31. The warrant affidavit described Hiramoto's viewing of Mr. Borgerson's work-issued laptop computer and the digital images he printed, at the UCB police officer's request, after searching the laptop. Exhibit K, Bates 33-34. Pursuant to the warrant, police searched Mr. Borgerson's home and office on October 30, 2006. Exhibit J, Bates 28.

On November 1, 2006, UCB police sought and obtained a state search warrant to search the evidence (UCB-issued laptop, power cord and compact flash media card) that they had searched and seized without a warrant on October 29, 2006. Exhibit L, Bates 54-60. The affidavit in support of this warrant is essentially the same as the affidavit in support of the warrant to search Mr. Borgerson's home, person and office. The warrant was served on November 2, 2006, and the evidence was turned over that day to a forensic analyst. Exhibit M, Bates 38.

**C.    UCB's policies about the privacy of electronic communications**

According to the discovery, Mr. Borgerson was given notice of and agreed to abide by three UCB computer-related policies:   UC Berkeley Computer Use Policy, UC Electronic Communications Policy; and CalMail Use Policies. Exhibit N, Bates 72. The Computer Use Policy, as provided in discovery, provides, in relevant part, that

> Students and employees may have rights of access to information about themselves contained in computer files, as specified in federal and state laws. Files may be subject to search under court order. In addition, systems administrators may access user files as required to protect the integrity of computer systems. For example, following organizational guidelines, system administrators may access or examine files or accounts that are suspected of unauthorized use or misuse, or that have been corrupted or damaged.

Exhibit O, Bates 79. The Computer Use Policy lists examples of misuse of UCB's computer systems; this list does not include file-sharing. Exhibit O, Bates 80.

UCB's Electronic Communications Policy, as provided in discovery, provides, in relevant part, that

> University employees who operate and support electronic communications resources regularly monitor transmissions for the purposes of ensuring reliability and security of University electronic communications resources and services . . . and in that process might observe certain transactional information or the contents of electronic communications. Except as provided elsewhere in this Policy or by law, they are not permitted to seek out transactional information or contents when not germane to system operation and support, or to disclose or otherwise use what they have observed.
>
> In the process of such monitoring, any unavoidable examination of electronic communications (including transactional information) shall be limited to the least invasive degree of inspection required to perform such duties. . . .
>
> Except as provided above, systems personnel shall not intentionally search the contents of electronic communications or transactional information for violations of law or policy.

Exhibit P, Bates 68.

Parts of UCB's Electronic Communications Policy that the government did not provide in discovery establish strong privacy protections for users of UCB's electronic communications services. *See* Electronic Communications Policy, attached as Exhibit Q.

> The University respects the privacy of electronic communications in the same way that it respects the privacy of paper correspondence and telephone conversations . . . . The University does not examine or disclose electronic communications records without the holder's consent. Nonetheless, subject to the requirements for authorization, notification, and other conditions specified in this Policy, the University may examine or disclose electronic communications under very limited circumstances . . . .

Exhibit Q, IV.A, p.10. In general,

> [a]n electronic communications holder's consent shall be obtained by the University prior to any access for the purpose of examination or disclosure of the contents of University electronic communications records in the holder's possession.

Exhibit Q, IV.B, p.10.

Although the policy allows for the inspection of "routine monitoring of electronic

BORGERSON, CR 07-0472 CW
MOTION TO SUPPRESS                               9

communications" and the inspection of network traffic "to confirm malicious or unauthorized activity that may harm the campus network or devices connected to the network," "[s]uch activity shall be limited to the least perusal of contents required to solve the situation." Exhibit Q, V.B, p.15. "If providers determine that it is necessary to examine suspect electronic communications records beyond routine practices, the user's consent shall be sought." *Id.*

Similarly, the CalMail policy provides that

> CalMail systems support staff do not routinely inspect, monitor, or disclose electronic communications without the holder's (creator's or recipient's) consent. Nonetheless, subject to the requirements for authorization, notification, and other conditions specified in the UC Electronic Communications Policy . . . electronic communications may be inspected, monitored, or disclosed under very limited circumstances.
>
> During the performance of their duties, personnel who operate and support CalMail may periodically need to monitor transmissions or observe certain transactional information to ensure the proper functioning and security of CalMail resources and services. On this and other occasions, systems personnel might observe the contents of CalMail electronic communications. Except as provided in the [Electronic Communications Policy] or by law, they are not permitted to seek out the contents or transactional information where they are not germane to the foregoing purposes, or disclose or otherwise use what they have observed.
>
> Such unavoidable inspection of electronic communications by CalMail support personnel is limited to the least invasive degree of inspection required to perform their duties. This authorization to perform system support duties does not exempt personnel from the prohibition against disclosure of personal and confidential information, except insofar as such disclosure equates with good faith attempts to route an otherwise undeliverable electronic communication to its intended recipients.

*See* CalMail Policy, attached as Exhibit R, IV.3. Moreover, the "examples of misuse" identified in the CalMail policy do not include filesharing. *Id.*, Appendix A.

None of the three policies authorizes a non-consensual search of a user's computer to investigate suspected work misconduct or even illegal activity. The Electronic Communications Policy states that electronic communication records may be examined without the record-holder's consent "when there is substantiated reason . . . to believe that violations of law or of

BORGERSON, CR 07-0472 CW
MOTION TO SUPPRESS                    10

University policies . . . have taken place" but, absent emergency circumstances, "such actions must be authorized in advance and in writing" by UCB officials. Exhibit Q, IV.B, pp.10-11. UCB also specifically allows use of its electronic communications services and facilities for "incidental personal purposes," as long as the personal use does not interfere with UCB's services or the employee's work duties or "burden the University with noticeable incremental costs." Exhibit Q, III.D.8., p.8.

## ARGUMENT

UCB employee Hiramoto's remote viewing of the contents of Mr. Borgerson's work-issued laptop computer was a search. UCB police also seized Mr. Borgerson's laptop computer without a warrant. Because Hiramoto and the UCB police are employees of a public, state university, their warrantless searches and seizures are government action within the ambit of the Fourth Amendment.

Mr. Borgerson had a reasonable expectation of privacy in his work-issued laptop computer. Hiramoto's search of Mr. Borgerson's laptop was not reasonable under the circumstances. The warrantless search of Mr. Borgerson's laptop computer violated the Fourth Amendment. All fruits of the unlawful searches and seizures must be suppressed.

**A.    Hiramoto searched Mr. Borgerson's laptop computer**

The remote viewing of computer files on a computer hard drive is a search. *See United States v. Heckenkamp*, 482 F.3d 1142 (9th Cir. 2007) (discussing whether remote search, by network administrator, of computer files on computer connected to university network violated Fourth Amendment); *United States v. Simons*, 206 F.3d 392, 398 (4th Cir. 2000) (discussing whether remote search, by computer staff, of computer of defendant, who worked for division of the CIA, violated Fourth Amendment).

**B.    Hiramoto's search was government action subject to Fourth Amendment limitations**

Because Hiramoto is the employee of a state (public) university, and his search was within the scope of his employment, his conduct qualifies as government action. *See O'Connor*

*v. Ortega*, 480 U.S. 709, 714-15 (1987) (searches and seizures by government employees are subject to Fourth Amendment) (plurality); *Simons*, 206 F.3d at 398 (holding that Fourth Amendment prohibits unreasonable searches by government employers and supervisors); *see also Heckenkamp*, 482 F.3d at 1143-48 (discussing whether search by state university computer support staff violated Fourth Amendment).

**C.    Mr. Borgerson had a reasonable expectation of privacy in his work-issued laptop computer**

Government employees have some reasonable expectation of privacy in their employer-issued property. *O'Connor*, 480 U.S. at 717-19; *Simons*, 206 F.3d at 398. In the case of public-sector employment, "the question whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis." *O'Connor*, 480 U.S. at 718. Under certain circumstances, employees have a reasonable expectation of privacy in the contents of their work computers. *See, e.g., Leventhal v. Knapek*, 266 F.3d 64, 73-74 (2d Cir. 2001); *United States v. Slanina*, 382 F.3d 670, 676 (5th Cir. 2002), *cert. granted and vacated on other grounds*, 537 U.S. 802 (2002); *see also Heckenkamp*, 482 F.3d at 1146 (holding that defendant had reasonable expectation of privacy in his personal computer that was connected to university computer network).

The extent of public-sector employees' reasonable expectation of privacy in their work computers depends in large part on "actual office practices and procedures." *O'Connor*, 480 U.S. at 717; *see, e.g., Heckenkamp*, 482 F.3d at 1147 ("privacy expectations may be reduced if the user is advised that information transmitted through the network is not confidential and that the systems administrator may monitor communications transmitted by the user."); *United States v. Thorn*, 375 F.3d 679, 682-83 (8th Cir. 2004), *cert. granted and remanded in light of Booker*, 543 U.S. 1112 (2005) (finding that state employer's computer-use policy defeated defendant's expectation of privacy in work computer); *United States v. Angevine*, 281 F.3d 1130, 1134-35 (10th Cir. 2002) (concluding that state university's policies and procedures precluded defendant's

1 reasonable expectation of privacy in work computer); *Leventhal*, 266 F.3d at 74 (finding that
2 employer's policy and practice did not defeat defendant's reasonable expectation of privacy);
3 *Simons*, 206 F.3d at 398 (finding no reasonable expectation of privacy in light of public
4 employer's Internet policy).

5     Mr. Borgerson had a reasonable expectation of privacy in his work-issued laptop
6 computer. The laptop was issued to Mr. Borgerson; he did not share it with any other employee.
7 Exhibit B, Bates 16. According to Hiramoto, Mr. Borgerson was given "administrative rights to
8 his computer[,] meaning he could install programs." Exhibit A, Bates 97. He had to use a
9 "'Calnet ID and Passphrase,'" which was "specific to each employee," to log on to the laptop.
10 Exhibit B, Bates 16. Mr. Borgerson told UCB police that he did not share his log in or pass code
11 with anyone. Exhibit I, Bates 25. Moreover, UCB's Electronic Communications Policy
12 specifically allowed some personal use of its electronic communications services. Exhibit Q,
13 III.D.8, p.8.

14     In addition, UCB's policies are very protective of users' privacy rights in their work
15 computers. UCB's Electronic Communications Policy, of which Mr. Borgerson was given
16 notice, states that UCB "respects the privacy of electronic communications" and does not, except
17 "under very limited circumstances, "examine or disclose electronic communications records
18 without the holder's consent." Exhibit Q, IV.A, p.10. Although the policy provides for "routine
19 monitoring of electronic communications" and inspection of "[n]etwork traffic . . to confirm
20 malicious or unauthorized activity that may harm the campus network or devices connected to
21 the network," Exhibit Q, V.B, p.15., Hiramoto's remote search of Mr. Borgerson's laptop was
22 not a search of network traffic; rather, he searched the contents of Mr. Borgerson's work
23 computer. Moreover, the search cannot be considered routine, as Hiramoto could recall only one
24 other occasion that he accessed a user's computer to investigate unusual activity. Exhibit A,
25 Bates 97. Finally, UCB policy mandates that even the limited permissible monitoring and
26 inspection "shall be limited to the least perusal of contents required to resolve the situation" and

BORGERSON, CR 07-0472 CW
MOTION TO SUPPRESS             13

further prohibits systems personnel from searching "for violations of law or policy." Exhibit Q, V.B, p.15; Exhibit P, Bates 68.

Under these circumstances, Mr. Borgerson's had a reasonable expectation of privacy in his UCB-issued laptop computer.

**D.   The warrantless search of Mr. Borgerson's laptop computer was not reasonable**

Warrantless searches are *per se* illegal unless the government carries its burden of showing that the search falls within an exception to the warrant requirement of the Fourth Amendment. *United States v. Ojeda*, 276 F.3d 486, 488 (9th Cir. 2002). "[P]ublic employer intrusions on the constitutionally protected privacy interests of government employees for noninvestigatory, work-related purposes, as well as for investigations of work-related misconduct, should be judged by the standard of reasonableness under all the circumstances." *O'Connor*, 480 U.S. at 725-26. The government bears the burden of establishing the reasonableness of "both the inception and the scope of the intrusion." *Id.* at 726. The government cannot establish that Hiramoto's warrantless search of Mr. Borgerson's UCB-issued laptop computer was reasonable either in its inception or in its scope.

A search generally will be reasonable at its inception if there are reasonable grounds to believe that it will turn up evidence that the employee is guilty of work-related misconduct or if it is necessary for a non-investigatory work-related purpose. *Id.* Hiramoto said that he remotely accessed Mr. Borgerson's computer to determine whether he had a file-sharing program. Because UCB policy did not prohibit file-sharing, however, Hiramoto was not authorized to search Mr. Borgerson's computer for evidence of file-sharing. Even if Hiramoto was authorized to investigate Mr. Borgerson for file-sharing, his search of Mr. Borgerson's computer could not be considered "necessary" given the obvious, simple and much-less-intrusive alternatives discussed above, such as shutting down the port or disconnecting the user. Moreover, as the defense expert stated, the bandwidth use indicated on the report on which Hiramoto relied did not

in any way reflect a danger or threat to the system.

The government also cannot establish that Hiramoto's search of Mr. Borgerson's laptop computer was reasonable in scope. A search will be reasonable in scope if the measures adopted are both reasonably related to the objectives of the search and not unduly intrusive given the nature of the misconduct. *Id.* This search was neither.

Hiramoto claimed that he was investigating file-sharing, which neither was against UCB policy nor posed a threat to the security or reliability of the network. The bandwidth report clearly identified the "large amount of data" as coming from a file-sharing ("gtela") port. After receiving the bandwidth report, Hiramoto immediately took the *most* intrusive action possible: he remotely accessed and searched Mr. Borgerson's work-issue laptop computer and launched what he claimed was suspicious and security-threatening file-sharing software. As the defense expert explained, remotely logging into Mr. Borgerson's computer was not a reasonable response to concerns about a threat to network security or integrity. Moreover, it appears that Hiramoto continued to search Mr. Borgerson's computer even after he identified the BearShare file-sharing program. He opened the program, launched it and viewed files in Mr. Borgerson's directories and subdirectories.

The government cannot carry its burden of establishing that Hiramoto's warrantless search of Mr. Borgerson's work-issued laptop computer was reasonable. Under the circumstances, the search was neither reasonable at its inception nor reasonable in its scope. All fruits of the warrantless search must be suppressed.

//

//

//

//

//

//

**CONCLUSION**

For the reasons stated above, the Court should suppress all fruits of the warrantless search of Mr. Borgerson's work-issued laptop computer. Alternatively, the Court should hold an evidentiary hearing.

Dated: April 23, 2008

                                                Respectfully submitted,

                                                BARRY J. PORTMAN
                                                Federal Public Defender

                                                        /S/

                                                ANGELA M. HANSEN
                                                Assistant Federal Public Defender