1  JOSEPH P. RUSSONIELLO (CASBN 44332)
   United States Attorney
2
   BRIAN J. STRETCH (CABN 163973)
3  Chief, Criminal Division

4  MERRY JEAN CHAN (CASBN 229254)
   DENISE MARIE BARTON (MABN 634052)
5  Assistant United States Attorneys

6     450 Golden Gate Avenue, 11th Fl.
      San Francisco, CA 94102
7     Telephone: (415) 436-6750
      Facsimile: (415) 436-6470
8     Email: merry.chan@usdoj.gov

9  Attorneys for Plaintiff

10

11              UNITED STATES DISTRICT COURT

12           NORTHERN DISTRICT OF CALIFORNIA

13                   OAKLAND DIVISION

14  UNITED STATES OF AMERICA,        )   No. CR 07-0472 CW
                                     )
15            Plaintiff,             )   UNITED STATES'S OPPOSITION
                                     )   TO DEFENDANT'S MOTION TO
16       v.                          )   SUPPRESS AND REQUEST FOR
                                     )   EVIDENTIARY HEARING
17  ERIC BORGERSON,                  )
                                     )   Date: May 14, 2008
18            Defendant.             )   Time: 2:30 p.m.
    _____)   Court: Hon. Claudia Wilken
19
    _____
20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

 A. The defendant's workplace computer. . . . . . . . . . . . . . . . . . . . . . . . . . . 1

 B. U.C. Berkeley's IT policies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

 C. Initial discovery of child pornography on the defendant's workplace
   computer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

 D. Reporting of child pornography . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

 E. The defendant's statements to law enforcement . . . . . . . . . . . . . . . . . . . 8

 F. Search of defendant's workplace computer . . . . . . . . . . . . . . . . . . . . . . 9

 G. Search of defendant's residence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

 I. The defendant had no reasonable expectation of privacy in his workplace
   computer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

  A. The defendant can not demonstrate that he had a subjective expectation of
    privacy in his work computer at the time of the search. . . . . . . . . . . . . . 10

  B. Any expectation of privacy the defendant had subjectively was not
    objectively reasonable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

  C. No evidentiary hearing is warranted because there is no material factual
    dispute regarding whether the defendant's expectation of privacy . . . . . . 14

 II. The search of defendant's workplace computer was justified under the special
   needs exception to the warrant requirement. . . . . . . . . . . . . . . . . . . . . . . . 15

  A. The search was justified at its inception. . . . . . . . . . . . . . . . . . . . . . . . 15

  B. The scope of the search was reasonable. . . . . . . . . . . . . . . . . . . . . . . . 16

  C. No evidentiary hearing is necessary. . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

# TABLE OF AUTHORITIES

## FEDERAL CASES

*New Jersey v. T.L.O.*, 469 U.S. 325 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Ortega v. O'Connor*, 146 F.3d 1149 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*O'Connor v. Ortega*, 480 U.S. 709 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Andrade-Larrios*, 39 F.3d 986 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Angevine*, 281 F.3d 1130 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Carrion*, 463 F.2d 704 (9th Cir. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Ewain*, 88 F.3d 689 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Heckenkamp*, 482 F.3d 1142 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . passim

*United States v. Katz*, 389 U.S. 347 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. McCarthy*, 77 F.3d 522 (1st Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Muick*, 280 F.3d 741 (7th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Simons*, 206 F.3d 392 (4th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Slanina*, 283 F.3d 670 (5th Cir.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Ziegler*, 474 F.3d 1184 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## FEDERAL STATUTES, RULES, AND GUIDELINES

18 U.S.C. § 2252A(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 2252A(a)(5)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## STATE STATUTES

California Senate Bill 1386. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**INTRODUCTION**

On July 20, 2007, a federal grand jury returned an indictment against the defendant charging him with one count of distributing child pornography, in violation of 18 U.S.C. § 2252A(a)(2), and two counts of possessing child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B).  His trial is currently set to begin on June 16, 2008.  On April 23, 2008, the defendant filed a motion to suppress evidence from his work computer, home, as well as his statements to law enforcement.  *See* Def. Mot. Suppress.

The defendant argues that the warrantless search by a University of California, Berkeley ("U.C. Berkeley") system administrator of his work-issued laptop computer violated his Fourth Amendment rights, and that all fruits of this search, including evidence in his home subsequently found pursuant to a warrant, and his admissions, should be suppressed.  *See id.*  The defendant is incorrect.  He had no legitimate expectation of privacy to the computer and the system administrator's intrusion was reasonable to investigate concerns that computer resources had been compromised or were being misused.

**STATEMENT OF FACTS[1]**

**A. The defendant's workplace computer**

In July 2006, the defendant, Eric Michael Borgerson, an attorney, was hired by U.C. Berkeley Institute of Industrial Relations ("IIR") to draft and edit articles on labor and employment law for the California Public Employee Relations ("CPER") program. *See* Borgerson Declaration ¶ 1.  For this purpose, he was issued a U.C. Berkeley laptop computer.  *See* Hiramoto Declaration ¶ 3.

Robert Hiramoto, the system administrator for the IIR building at 2521 Channing Way, Berkeley, California, issued and set up the defendant's work computer for him.  *See id.* ¶¶ 1-3.  Hiramoto met with the defendant and told him, as he did all of the employees

---

[1]This Opposition relies on facts in declarations submitted by Robert Hiramoto, Karen Eft, Hadidjah Rivera, John Ives, and Lydia Durben.

at the IIR building, that he could remotely log on to the workplace computers when they were plugged into the University's network in order to trouble-shoot or conduct maintenance on the computers. *See id.* He asked the defendant not to turn off his computer on weekends because the remote-access program only worked if the computer was on, and Hiramoto often conducted maintenance and installed software updates on the weekends to avoid interfering with employees' work-week usage of computers. *See id.* ¶¶ 2-3. Hiramoto also told the defendant that he had set up a private folder for him on the server in the Z drive that Hiramoto was not permitted to access without the defendant's or his manager's consent. *See id.*

Because Hiramoto anticipated that the defendant might take the laptop home and need to connect the computer to peripherals such as non-workplace printers, Hiramoto gave the defendant administrative rights to the laptop which allowed him to install programs. *See id.* ¶ 3.

The defendant's work computer, as with all IIR work computers, had a static IP address. *See id.* ¶ 7. The defendant's computer's static IP address was 128.32.94.9. *See id.* He was supposed to connect his work laptop to one specific network connection or wall jack, named c2521-210-2.IIR. *See id.* The name of the network connection reflected its physical location. *See id.* "2521" stood for 2521 Channing Way, the address of the IIR building. *See id.* "210" stood for office 210, the office Borgerson was assigned, and the only office to which he was given a key. *See id.;* Rivera Declaration ¶ 11. "2" stood for jack number two in the office. *See* Hiramoto Declaration ¶ 7. "IIR" stood for the Institute of Industrial Relations. *See id.*

**B. U.C. Berkeley's IT policies**

When the defendant began working at the IIR, he set up a U.C. email account. *See* Eft Declaration ¶ 13. In order to create a calmail.berkeley.edu account, the defendant was required to read and agree to abide by the U.C. Berkeley Computer Use Policy – specifying appropriate use of computers at U.C. Berkeley, the University of California ("U.C.") Electronic Communications Policy – governing use of email at all U.C.

campuses, and the CalMail Use Policies – specifying additional requirements for appropriate use of CalMail. *See id.*

The Computer Use Policy applies to use of all Berkeley Campus computing resources. *See* Def. Mot. Suppress, Exh. O. The policy explains that users of the University's computers and networks must "respect the integrity of the systems and related physical resources, and observe all relevant laws, [and] regulations . . . ." *Id.* at 1. "[S]ystem administrators may access user files as required to protect the integrity of computer systems. For example, following organizational guidelines, system administrators may access or examine files or accounts that are suspected of unauthorized use or misuse, or that have been corrupted or damaged." *Id.* The policy further states that "[a]ll existing laws (federal and state) and University regulations and policies apply, including not only those laws and regulations that are specific to computers and networks, but also those that may apply generally to personal conduct." *Id.* "Offenses which are in violation of local, state, or federal laws may result in the restriction of computing privileges, and will be reported to the appropriate University and law enforcement authorities." *Id.* at 4.

The Electronic Communications Policy ("ECP") applies to all electronic communications resources owned or managed by the University. *See* Def. Mot. Suppress, Exh. Q at 2. The ECP notes that the University "prohibits the use of University property for illegal purposes and for purposes not in support of the mission of the University." *Id.* at 4. University electronic communications resources may not be used for unlawful activities. *See id.* at 6-7. Users may only use resources for incidental personal purposes where such use does not interfere with the University's operation of electronic communications resources, interfere with the user's employment or other obligations to the University, or burden the University with noticeable incremental costs. *See id.* at 8.

To enforce those purposes, and "ensur[e] reliability and security of University electronic communications resources and services," "University employees who operate and support electronic communications resources regularly monitor transmissions." *Id.* at

14-15.  In the course of doing so, they "may observe certain transactional information or contents of electronic communications." *Id.*  "Network traffic may be inspected to confirm malicious or unauthorized activity that may harm the campus network or devices connected to the network.  Such activity shall be limited to the least perusal of contents required to resolve the situation.  User consent is not required for these routine monitoring practices." *Id.* at 15.  Systems personnel should limit to the "least invasive degree of inspection required" for them to perform their duties, and are not allowed to "intentionally search . . . for [evidence of] violations of law or policy." *Id.* at 14.  However, if systems personnel "inadvertently discover or suspect improper governmental activity (including violations of law or University policy)," they shall report these violations.  *Id.*  Improper governmental activity is defined as any activity by a state employee in the performance of the employee's official duties, whether or not that action is within the scope of his employment, that is in violation of any state or federal law or regulation, or is economically wasteful, or involves gross misconduct, incompetency, or inefficiency.  *See* U.S. Opp. Def. Mot. Suppress, Exh. A (University of California Whistleblower Policy) at 2.

The ECP notes that U.C. Berkeley respects the privacy of electronic communications in the same way that it respects the privacy of paper correspondence and telephone converations, and generally will not examine or disclose electronic communications records without the holder's consent.  *See* Def. Mot. Suppress, Exh. Q at 10.  However, the Policy states that examination or disclosure may be made of electronic communications records without the holder's consent when there is substantiated reason to believe that violations of law have taken place or when there are compelling circumstances.  *See id.* at 10-11.  Access without consent generally must be authorized in advance by top University officials.  *See id.* at 11.  Post-hoc authorization is sufficient in emergency circumstances, where there is a high probability that delaying action would almost certainly result in circumstances in which failure to act might result in loss of significant evidence of one or more violations of law.  *See id.* at 10-11, 18-19.

Examination of the contents of electronic communications records under emergency circumstances should be limited to the "least perusal of contents and the least action necessary to resolve the emergency." *See id.* at 11.

A 2002 posting shows that U.C. Berkeley employees were instructed that "staff employees should not be sharing and playing" files, even if they are legal under copyright law, "to provide personal entertainment."  Def. Mot. Suppress, Exh. G.  "File-sharing activities require significant campus resources to support their use (including computers, network connectivity service, etc.), so they clearly exceed the limits on "incidental" personal use defined in the U.C. Electronic Communications Policy . . . ."  *Id.*  Employees are permitted to use online file-sharing programs only for work-related assignments.  *See id.*  The posting went on to explain that the standard for use is different for faculty and students than for employees.  *See id.*  Borgerson was neither faculty nor student.  *See* Rivera Declaration ¶ 5.

### C. Initial discovery of child pornography on the defendant's workplace computer

On the afternoon of Saturday, October 28, 2006, Hiramoto, the IIR system administrator, received and reviewed a bandwidth usage report for the previous day.  *See* Hiramoto Declaration ¶ 11.  Hiramoto was responsible for ensuring the security of the IIR building's computer network.  *See id.* ¶ 4.  The network contains private and protected data and is one of the fastest systems available, and is therefore at risk for intrusion by hackers.  *See id.* ¶ 5.  Hiramoto was particularly vigilant about security at the IIR building because there had been a huge security breach in the network in his building in the summer and fall of 2004.  *See id.* ¶ 5.  At the time, the breach, which involved private information protected by California Senate Bill 1386, was the largest data theft of its kind, and the FBI's investigation of it had shut down the IIR. *See id.*; Rivera Delcaration ¶ 2.

One of the ways in which Hiramoto would detect possible intrusion by hackers was by reviewing the bandwidth report, which showed the volume of data transmitted

over communication ports through each computer connection (or node) in the building each day. *See* Hiramoto Declaration ¶¶ 6-10. Each computer has 65,535 ports. *See id.* ¶ 8. Each port is a connection by which a computer may connect with another computer over the Internet. *See id.* Some ports are standardized, but many ports, especially high-number ports, are not standardized. *See id.* Unexplained anomalies in the bandwidth usage report would suggest unauthorized computer activity, which it was Hiramoto's job to investigate. *See id.* ¶¶ 4, 10. What might be normal bandwidth use for another department might be abnormal for the IIR. *See id.* ¶ 10; Ives Declaration ¶ 2. What might be normal one day might be cause for concern on another, depending on what Hiramoto knew was happening at the IIR. *See* Hiramoto Declaration ¶ 10. High bandwidth use over a standardized port indicating web traffic might not be unusual, but such bandwidth use over a non-standardized port might be cause for alarm. *See id.*

When he reviewed the bandwidth usage report for Friday, October 27, 2006, Hiramoto saw that a large amount of data was transferred over what appeared to be a file-sharing program ("gtela") through connection c521-210-2. *See id.* ¶ 11; Def. Mot. Suppress, Exh. D at 1. It was highly unusual that this much data was being transferred through a file-sharing program. *See* Hiramoto Declaration ¶ 11. Employees were not supposed to use file-sharing for personal purposes. *See* Def. Mot. Suppress, Exh. G. Hiramoto was familiar with the programs IIR workers used in their work, and did not believe that these included file-sharing programs. *See* Hiramoto Declaration ¶ 11. Moreover, Hiramoto had never seen such a large amount of data being transmitted through a file-sharing program in the IIR building. *See id.* Consequently, Hiramoto became suspicious that the computer and/or the building's computer network had been compromised. *See id.* He knew that connection c521-201-2 was assigned to the computer with IP address 128.32.94.9, and decided to access that computer to investigate. *See id.* ¶¶ 7, 11.

Because Hiramoto was working from home, he used a remote program to access this computer and saw that the computer was on and that the defendant was logged into

the machine.  *See id.* ¶ 12.  Because the defendant had failed to lock the computer, Hiramoto could see the desktop.  *See id.* ¶ 13.  He could not, however, immediately determine whether there were any file-sharing programs installed or running, which was his purpose in looking at the computer.  *See id.*  ¶¶ 13-15.  Hiramoto checked to see what programs had been loaded on the computer and saw that BearShare, a file-sharing program not connected with U.C. Berkeley in any way, was installed.  *See id.* ¶ 14.  Based on where BearShare was on the list of programs, Hiramoto believed that the program had recently been downloaded onto the computer.  *See id.*  Hiramoto clicked on the BearShare icon to see if any file sharing programs were currently sharing files and saw that many file names were in a queue, ready to be downloaded.  *See id.* ¶ 15.  The names in the queue, such as "9 year old rape," indicated that the files pertained to child pornogrpahy.  *See id.*

Although Borgerson had administrative rights to his computer which allowed him to download programs such as BearShare, the fact that the files queued for download appeared to be illegal concerned Hiramoto.  *See id.* ¶ 16.  Worried that the file-sharing program had been installed and triggered via a virus or malicious program, Hiramoto checked the list of recent documents.  *See id.*  Seeing a document such as joke.exe would suggest that the defendant had opened an email attachment containing a virus or malicious program, and might indicate a system-wide attack.  *See id.*  Hiromoto did not see any such documents, but he did see a file with a name suggesting child pornography.  *See id.*  He right-clicked to see where this was saved and found that it was stored in a non-standard directory named C:\windows\xerxes.  *See id.*  Hiramoto wanted to check the directory to see the extent of the damage, to check for any malicious programs that might be stored in the directory, and so that he could direct network security specialists in the Systems and Network Security Group to the site of concern.  *See id.* ¶ 17.

When Hiramoto went to the directory, he saw that it contained numerous video files with names indicating child pornography.  *See id.*  When Windows XP displays files that are video files, the window often shows a thumbnail or one frame of the video file.  *See* Def. Mot. Suppress, Exh. C at 2.  Hiramoto saw what appeared to be children in

several video file thumbnails. *See* Hiramoto Declaration ¶ 17.

Hiramoto took a few screen-shots of the defendant's computer, documenting what he had seen. *See id.* ¶ 18. He then shut down the BearShare program, logged the defendant off, and shut down the machine. *See id.* This occurred at 6:42 p.m., ten minutes after he had initially logged onto the computer. *See* Durben Declaration ¶ 5.

**D. Reporting of child pornography**

Based on his diagnostic measures and shutting off of the defendant's computer, Hiramoto did not believe that the system was in any immediate danger. *See* Hiramoto Declaration ¶ 20. He was not sure how to proceed. *See id.* After considering his options overnight, he ultimately decided to contact Jake Harwood, a member of U.C. Berkeley's Systems and Network Security Group, the next day. *See id.* Harwood called the U.C. Police Department and advised Hiramoto to cooperate fully. *See id.* An officer went to the IIR building with Hiramoto to seize the laptop. *See id.* ¶ 21. Hiramoto was unable to find the laptop in Borgerson's office. *See id.* Only after going into several other offices did Hiramoto finally locate the defendant's laptop in office 217, which was locked. *See id.* He found that a desktop computer had been disconnected from its jack, and that the defendant's laptop was plugged into that data connection. *See id.*

Office 217 was not the defendant's assigned office, but the office of colleague Katherine Thomson who shared it with an intern; both had been away from the office on Friday, October 27, 2006. *See* Rivera Declaration ¶ 11. The defendant did not have independent access (*e.g.*, the key) to this office. *See id.* Borgerson0125, 134.

**E. The defendant's statements to law enforcement**

On Monday, October 30, 2006, the defendant agreed to speak with the police about a potenital security breach on his computer. *See* Durben Declaration ¶ 2. He admitted to downloading BearShare to his work computer, but initially stated that he had only used it to download music. *See id.* He later stated that he had only accidentally downloaded child pornography. *See id.* He then stated that he had downloaded child pornography intentionally because he was interested in people's fantasy and because he did not believe

the files would depict real children.  *See id.*  Finally, he admitted that he had begun

downloading child pornography six months earlier.  *See id.*

**F.  Search of defendant's workplace computer**

On November 1, 2006, a search warrant was issued permitting search of the

defendant's work laptop computer.  *See id.* ¶ 3.  The computer was found to contain

eighteen video files of child pornography.  *See id.*  The video files were found in multiple

folders on the C drive, including the xerxes folder seen by Hiramoto.  *See id.*

The computer was also found to have a video file entitled "21b.avi" documenting

conversation on the afternoon of October 27, 2006 between "joseph schmosef" and

"guardsmen21b" during which joseph schmosef sent four child pornography video files.

*See id.*  The video showed "joseph schmosef" watching "guardsman21b" masturbate

while chatting about rape fantasies and sending him child pornography.  *See id.*  The

video files "joseph schmosef" sent "guardsman21b" included a video of an infant girl

being raped by an adult male; the baby's cries of pain as well as the man's instructions for

her to hush are audible on the soundtrack.  *See id.*

**___G.  Search of defendant's residence**

On October 30, 2006, the defendant's residence at at 2625 School Street, Oakland,

California was searched pursuant to a search warrant.  *See id.* ¶ 4.  During the search, the

defendant's domestic partner expressed disappointment that the defendant's problem had

recurred and stated that he had forbidden the defendant from keeping pornographic

materials at home.  *See id.*  The search recovered several computers and media.  *See id.*

One of the computers contained a user folder named "Joe Schmow."  *See id.*  A CD

containing a sub-folder entitled "joeschmow" was also found.  *See id.*  Other media

containing child pornography were also found.  *See id.*

//

//

9

**ARGUMENT**

**I.  The defendant had no reasonable expectation of privacy in his workplace computer**

The Fourth Amendment prohibits unreasonable searches and seizures by government agents, including government employers or supervisors.  *See New Jersey v. T.L.O.*, 469 U.S. 325, 335-37 (1985) (holding that searches conducted by public school officials are subject to Fourth Amendment).  Because Hiramoto was an employee of U.C. Berkeley, which is a public institution, and searched the defendant's work computer pursuant to his work function, the Fourth Amendment is potentially implicated.  The threshold inquiry under the Fourth Amendment is whether the defendant had a reasonable expectation of privacy in his work computer.  *See United States v. Heckenkamp*, 482 F.3d 1142, 1146-47 (9th Cir. 2007).  He did not.

**A.  The defendant can not demonstrate that he had a subjective expectation of privacy in his work computer at the time of the search**

A person has a reasonable expectation of privacy if he can "demonstrate a subjective expectation that his activities would be private, and he [can] show that his expectation was one that society is prepared to recognize as reasonable."  *Id.* at 1146 (internal quotation and citation omitted).  In this case, the defendant did not demonstrate a subjective expectation that his activities in his work computer would be private.  He left his work laptop powered on, logged in, and unattended in a colleague's locked office, not his own, over the weekend.  *See supra* Statement of Facts, Part C & D.  He was never issued a key to this office, but knew that at least the assigned occupants had been.  *See id.* at Part D.  The defendant could have logged-off to prevent any passerby from viewing his desktop and accessing his account, but he did not.  *See* Hiramoto Declaration ¶¶ 2-3.  He could have shut off his computer to do the same, and this would have also prevented any system administrator from logging on remotely with his administrative privileges, but he did not.  *See id.*  With respect to his child pornography files, the defendant saved them on his hard-drive, which he knew the system administrator could access and which any person who happened upon his computer in its unattended state could have accessed.  *See*

*id.* ¶¶ 13, 16-17.  He could have saved them to the Z drive, which Hiramoto had set up for private files and which Hiramoto would not access without express consent.  *See id.* ¶¶ 2-3.  Again, the defendant failed to take an action that would show that he expected his computer files to remain private.

The defendant's actions contrast sharply with those of defendants whose actions Courts of Appeals have found to demonstrate a subjective expectation of privacy.  In *United States v. Slanina*, 283 F.3d 670, 675-76 (5th Cir.), vacated on other grounds, 537 U.S. 802 (2002), for example, the Fifth Cricuit found that Slanina had demonstrated a subjective expectation of privacy in his work computer because he had left it in his own office, whose door was closed and locked at the time of the search.  He had also installed passwords to limit access to his computer files.  *See id.* at 676.  In fact, the system administrator had to contact Slanina for his password in order to access the computer's hard drive.  *See id.* at 672.  When Slanina provided the password to the administrator, he specifically limited the access for the purpose of installing the network.  *See id.*

The circumstances of the defendant's computer also contrast with those in *United States v. Heckenkamp*, 482 F.3d 1142 (9th Cir. 2007).  For one thing, the computer at issue in that case was Heckenkamp's personal computer rather than a work-issued computer.  *See id.* at 1146.  Moreover, Heckenkamp demonstrated his subjective expectation of privacy in his computer by keeping it in his own dormitory room and locking it such that no one could access the computer without inputting the correct password.  *See id.*

**B.  Any expectation of privacy the defendant had subjectively was not objectively reasonable**

Even if the defendant subjectively believed that his computer would remain private, this expectation was not reasonable because he knowingly exposed his computer to the public.  *See United States v. Katz*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.").  In *United States v. McCarthy*, 77 F.3d 522, 535 (1st

Cir. 1996), the First Circuit found that McCarthy had no reasonable expectation of privacy in a suitcase because he had left it unlocked and open – in "plain view" – in another's room. The defendant in this case did the same thing. He left his computer unlocked and open in someone else's workspace.

Any expectation the defendant had in his work computer was also objectively unreasonable in light of U.C. Berkeley's IT policies and the IIR's practices regarding system administrator access to employee work computers. *See O'Connor v. Ortega*, 480 U.S. 709, 717-18 (1987) (plurality opinion) (holding that reasonableness of employee's expectation of privacy in his work computer "may be reduced by virtue of actual office practices and procedures, or by legitimate regulation"). U.C. Berkeley's Computer Use Policy and Electronic Communications Policy, to which the defendant agreed, both make it clear that employees have little to no expectation of privacy to their work computers. *See supra* Statement of Facts, Part B. The Computer Use Policy explicitly states that "system administrators may access user files as required to protect the integrity of computer systems." Def. Mot. Suppress, Exh O at 1. They may "access or examine files or accounts that are suspected of unauthorized use or misuse or that have been corrupted or damaged." *Id.* The defendant had no way of knowing when the integrity of the computer systems would require a system administrator to access his computer, and therefore could have no expectation that his computer would be free from access at any given point in time. In fact, given that the defendant was actually misusing his work computer to download and transmit pictures and videos of child pornography, in violation of state and federal law, he could reasonably expect that there would be some suspicion regarding his computer which would trigger an examination permitted under the policy.

The Electronic Communications Policy also makes clear that employees have little to no expectation of privacy in their work computers. In its section on privacy, the ECP explains that while system administrators are not generally permitted to pry into individual users' accounts, they "regularly monitor transmissions for the purpose of ensuring reliability and security of University electronic communications resources and

services" and may seek out transactional information or contents when "germane to system operations and support." Def. Mot. Suppress, Exh. Q at 14. The ECP does restrict system administrators to limit their intrusions to the least invasive degree of inspection required to perform their system operations and support duties, but gives no assurances that at any given time, system operations and support will not require very invasive inspection. *See id.* Moreover, the ECP provides that discovery of improper governmental activity (*e.g.,* violation of federal law such as the distribution, receipt, and possession of child pornography) in the course of such inspections shall be reported. *See id.* The ECP's section on security further explains that electronic communications are subject to "routine monitoring" and inspection for malicious or unauthorized activity without user consent. *See id.* at 15. The defendant could not reasonably expect that his use of the Internet would not be monitored or that his downloading of child pornography would not be examined.

In addition to these official written policies, the practices and procedures in the defendant's particular division made any expectation the defendant had that his computer would remain free from examination unreasonable. The IIR had been subject to one of the largest data thefts in history in 2004, and consequently security and monitoring of computers was especially tight in the building. *See* Hiramoto Declaration ¶ 5. Hiramoto specifically told all the IIR employees, including the defendant, that he could remotely access employee computers, and that he did so regularly to perform maintenance and software updates on the weekends. *See id.* ¶¶ 2-3.

These policies and procedures diminished any expectation of privacy the defendant could have had in his work computer. *See United States v. Ziegler*, 474 F.3d 1184, 1190 n.9 , 1191-92 (9th Cir. 2007) (suggesting that defendant would not have reasonable expectation of privacy in company computer assigned to him for business use if computer had been physically located outside private office, in light of corporate policy of monitoring corporate computers); *see also United States v. Angevine*, 281 F.3d 1130,1132, 1134-35 (10th Cir. 2002) (finding college professor who downloaded images

of child exploitation to his work computer had no reasonable expectation of privacy in that computer because college's computer-use policy made it clear that system administrators were free to view data downloaded from Internet and warned users not to use work computers in ways that violated federal law); *United States v. Muick*, 280 F.3d 741, 743 (7th Cir. 2002) (explaining that private company's announcement that it could inspect laptops furnished for work use "destroyed any reasonable expectation of privacy" defendant might have had in his work computer); *United States v. Simons*, 206 F.3d 392, 395, 398-99 (4th Cir. 2000) (finding that policy limiting use of Internet to work purposes and providing for electronic audits to ensure compliance evaporated any expectation of privacy CIA employee had in his work computer); *compare Heckenkemp*, 482 F.3d at 1147 (finding university policy did not diminish user's expectation of privacy in transmissions over Internet made on university network because policy did not provide for monitoring of network).

### C. No evidentiary hearing is warranted because there is no material factual dispute regarding whether the defendant's expectation of privacy

Although the parties may disagree about the legal conclusions to be drawn from the facts regarding whether the defendant had a reasonable expectation of privacy in his work computer at the time the system administrator searched it, there is no dispute as to the underlying facts. The United States submits that cumulatively, the undisputed facts show that the defendant had no reasonable expectation of privacy in his work computer. Because a finding by this Court that the defendant had no reasonable expectation of privacy in his work computer would resolve the defendant's motion to suppress, no evidentiary hearing is necessary. *See United States v. Andrade-Larrios*, 39 F.3d 986, 991 (9th Cir. 1994); *United States v. Carrion*, 463 F.2d 704, 706 (9th Cir. 1972) ("Evidentiary hearings need be held only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that relief must be granted if the facts alleged are proved.") .

**II. The search of defendant's workplace computer was justified under the special needs exception to the warrant requirement**

Even assuming the defendant had a reasonable expectation of privacy in his work-issued computer, Hiramoto's warrantless search of it was justified under the special needs exception to the warrant requirement. *See Heckenkemp*, 482 F.3d at 1147.

**A. The search was justified at its inception**

It was Hiramoto's job as system administrator for the IIR building to investigate potential breaches of network security. *See* Hiramoto Declaration ¶ 4. Hiramoto accessed the defendant's computer because the bandwidth usage report showed an anomaly concerning a high amount of data flowing through what appeared to be a file-sharing program. *See id.* ¶ 11. The defendant argues that the amount of bandwidth use associated with the defendant's computer was not alarming. *See* Def. Mot. Suppress at 3-4. But his argument is based on the supposition that only amounts of bandwidth use that would essentially cripple the network are anomalies worthy of investigation. This supposition is false. Hiramoto used the bandwidth report to spot worrisome anomalies, and large bandwidth running through the file-sharing port was worrisome. *See* Hiramoto Declaration ¶ 11.

Even though file-sharing programs may be used for legitimate purposes, only faculty and students at U.C. Berkeley were permitted to use file-sharing for personal purposes, and the defendant was neither. *See* Def. Mot. Suppress, Exh. G; Rivera Declaration ¶ 5 . Hiramoto believed that file-sharing programs were not used by IIR employees for work purposes, and he had never seen a file-sharing program conducting that much data through an IIR machine before. *See* Hiramoto Declaration ¶ 11. These facts aroused his concern that the file-sharing program was sharing out protected information contained on U.C. Berkeley's network, or that an unauthorized user had hi-jacked the computer for his or her own purposes. *See id.* ¶¶ 11-12. Hiramoto's concern for the security of the network is also evidenced by his hesitation in reporting the child pornography that he discovered on the defendant's computer once he had satisfied

himself that there was no wider security threat to the network, and his decision to report his findings to the campus Network and Systems Security Group instead of to law enforcement directly. *See id.* at 20. Hiramoto's actions were "purely within the scope of his role as a system administrator," and authorized by the U.C.'s computer use policies. *See Heckenkemp,* 482 F.3d at 1147-48. Hiramoto's search of the defendant's computer was justified at its inception under the special needs exception to the warrant requirement. *See id.; Ortega v. O'Connor,* 146 F.3d 1149, 1158 (9th Cir. 1998) (noting that whether search is reasonable depends on whether "the search was justified at its inception and whether the search itself was reasonably related in scope to the circumstanced that justified it").

**B. The scope of the search was reasonable**

The defendant argues that even if the special needs exception applies, the intrusiveness of Hiramoto's search outweighed the need to search, and therefore, the search was unreasonable and unconstitutional. *See* Def. Mot. Suppress at 3-6, 14-15. He is wrong.

Hiramoto's actions were reasonably related to his purpose of diagnosing any security breach that had occurred. He was on the defendant's computer for a total of ten minutes. *See* Durben Declaration ¶ 5. In *Heckenkemp*, the Ninth Circuit noted that the university network administrator's 15-minute remote search of a computer in the interest of security the university's network was reasonable. *See* 482 F.3d at 1148. During the short time that Hiramoto was on the defendant's computer, he first went to the list of programs to confirm that there was a file-sharing program. *See* Hiramoto Declaration ¶ 14. He then checked to see if it was still running, and that it was not sharing out protected data. *See id.* ¶ 15. In doing so, he found that the defendant had set the program up to download child pornography. *See id.* At that point, Hiramoto had inadvertently discovered enough evidence of improper governmental activity (*i.e.,* violations of federal laws pertaining to child pornography, misuse of U.C. property) to report the defendant. There was probable cause for officers to search and seize the computer.

Hiramoto's further examination of the defendant's computer, however, was also reasonably related to his goal of securing the network. He suspected that someone or something other than the defendant was responsible for downloading the child pornography. *See id.* ¶ 16. To see whether this might be the case, he checked the list of recent documents to see whether the defendant had recently opened a document likely to have carried a virus. *See id.* When he saw that a recent document included a file that appeared to contain child pornography, he checked to see where that file was stored, and then checked whether that directory folder contained any malicious programs. *See id.* ¶¶ 16-17. All of these measures were reasonably related to the objective of determining if the computer system had been compromised, and were not excessively intrusive.

Hiramoto's actions were also entirely consistent with U.C. Berkeley's IT policies. It is clear from the policies themselves that system administrators like Hiramoto are permitted to monitor and investigate computers when there is a concern of security compromise. *See supra* Statement of Facts, Part B; Argument, Part I.B. Those responsible for enforcing compliance with IT policies at U.C. Berkeley concur. *See* Eft Declaration ¶¶ 3, 11, Exh. A; Rivera Declaration ¶¶ 9-10. Karen Eft, U.C. Berkeley's Electronic Communications Policy coordinator, explains that the policies permit monitoring and examination of employees' work computers for purposes germane to system operations and support, and views Hiramoto's actions as within this scope. *See* Eft Declaration ¶¶ 3-7.

The defendant suggests that Hiramoto's actions did not conform with policy requirements because they were done without advanced authorization. *See* Def. Mot. Suppress 8-10, 13. This is simply not the case. The privacy section of the Electronic Communications Policy first explains that authorization is generally required before a user's electronic communications records may be "Access[ed] Without Consent." *See* Def. Mot. Suppress Exh. Q at 10. Then, in a section on "Privacy Limits," the ECP explains that such authorization is not necessary when work is germane to system operations and support. *See id.* at 13-14. Because Hiramoto's actions were germane to

1   systems operations and support, they did not qualify as "access without consent" requiring

2   authorization. This interpretation of the ECP is supported by Eft. *See Eft Declaration ¶*

3   7; *see also* Rivera Declaration ¶¶ 9-10. In any case, access without consent may be done

4   without advanced consent under emergency circumstances. *See Def. Mot. Suppress, Exh.*

5   Q at 11, 18-19. U.C. Berkeley gave Hiramoto post-hoc authorization for his actions,

6   finding that there were time-dependent, critical operational circumstances, and his failure

7   to act immediately might have resulted in significant property damage or loss of evidence

8   of violations of law or University policies. *See Eft Declaration ¶ 3, 11, Exh. A.*

9       Furthermore, it should be noted that the Electronic Communications Policy only

10  protects the contents of users' "electronic communications," which it defines specifically

11  as not including files that have not been transmitted. *See Def. Mot. Suppress, Exh. Q at*

12  14. Hiramoto immediately saw evidence of child pornography when he accessed the

13  BearShare program, but this was in the form of file names listed as ready for download.

14  These file names were not electronic communications under the ECP because the files

15  themselves had not yet been transmitted. *See Def. Mot. Suppress, Exh. Q at 18.*

16      The defendant also argues that to address any security concerns, Hiramoto could

17  have and should have simply shut off the defendant's computer if he had been concerned

18  about a security breach. *See Def. Mot. Suppress at 5.* Hiramoto explains that suspicion

19  of a security breach requires investigation to understand whether there has been a security

20  the breach, the nature of that breach, and the magnitude of that breach. *See Hiramoto*

21  Declaration ¶¶ 12-17. File-sharing programs can have legitimate uses, and Hiramoto

22  knew that Borgerson had the ability to install a file-sharing program onto his computer.

23  *See id. ¶ 11.* Only investigation would allow Hiramoto to determine whether the anomaly

24  on the bandwidth report pointed to pernicious activity or legitimate use by the defendant.

25  Moreover, Hiramoto does not immediately shut off a computer whenever he suspects it

26  might be a point of security breach because his suspicions may prove wrong upon

27  investigation, and shutting off a computer peremptorily may disrupt the user's work. *See*

28  *id. ¶ 18.* In any case, Hiramoto was working from home. In order to shut off the

defendant's computer quickly, he would have had to remotely access the defendant's computer to shut it off. *See id.* ¶ 19.

The defendant's suggestions for other actions that Hiramoto might have more easily taken to resolve his security concern are not based in reality. Hiramoto could not have simply "closed the port entirely or restricted the amount of bandwidth allocated to the associate device" or "immediately suspend[ed] Mr. Borgerson's user account" or "disrupt[ed] network service to his device." Def. Mot. Suppress at 5. It is technically difficult and time-consuming to shut off one out of 65,535 ports on a computer, and not particularly effective. *See* Hiramoto Declaration ¶ 19. It is technically infeasible to restrict the amount of bandwidth allocated to a particular computer. *See id.* Hiramoto does not have the ability to suspend any user account on his own authority. *See id.*; Def. Mot. Suppress, Exh. R (CalMail Service Policy, § V.C). And for Hiramoto to disconnect the computer from the network, he would have had to physically go to work, hunt down the computer – which was not in the defendant's assigned work-space – and physically remove it. *See* Hiramoto Declaration ¶ 19. Hiramoto did not contact the defendant about the anomalous bandwidth usage because he learned of it on the weekend, and did not have any non-work contact information for the defendant. *See id.* ¶ 12.

**C. No evidentiary hearing is necessary**

The United States does not dispute that file-sharing programs have legitimate uses, and that 156MB is not an amount of data that could cripple the U.C. Berkeley network, the facts the defendant relies on for his argument that Hiramoto had no reason to examine his computer. *See* Def. Mot. Suppress at 14-15; Fischbach Declaration, Apr. 23, 2008, at ¶¶ 5, 8-9. Rather, the United States has put forth additional undisputed facts showing that 156MB of data transferring through a file-sharing program was cause for concern and investigation because it was an anomaly in the bandwidth use pattern at the IIR building. Such an anomaly could point to a hacker or some compromise of the system, perhaps one involving the sharing or theft of protected data. Only investigation could resolve such a concern.

There is a factual dispute regarding whether the system administrator's actions in investigating this concern were reasonable. The defendant's forensic examiner opines that remotely accessing the defendant's computer "would not have revealed whether the security or integrity of the system had been compromised, as nefarious software such as viruses are known to operate covertly." *Id.* at ¶ 11. Hiramoto has submitted a declaration to the contrary, explaining the rationale for his examination of the defendant's work computer. However, this factual dispute is not material because this Court can find Hiramoto's examination of the defendant's work computer was reasonable on other grounds. Fischbach's declaration notes that file-sharing programs are also conduits for virus infiltration to a network. *See* Fischbach Declaration, Apr. 23, 2008 at ¶ 9. Fischbach trivializes this concern, noting that e-mails can also admit viruses into a network. *See id.* But just because the network is vulnerable to viruses from email does not mean that a system administrator should not be concerned about additional openings for network compromise. Such concern would have justified Hiramoto's investigation of the defendant's use of a file-sharing program. *See United States v. Ewain*, 88 F.3d 689, 694 (9th Cir. 1996) (holding that officer's subjective intent is irrelevant to reasonableness of search). Hiramoto would have been justified in checking to see that the file-sharing program was not admitting problem files, and would have been justified in remotely accessing the defendant's computer to do so. In checking the file-sharing program, Hiramoto would have seen that the files being downloaded were of child pornography.

//

//

//

//

**CONCLUSION**

For the foregoing reasons, the United States respectfully asks this court to deny the defendant's motion to suppress and for an evidentiary hearing. If this Court does order an evidentiary hearing, the United States urges that it be on the limited factual dispute outlined above regarding whether the system administrator could have begun to verify whether the security or integrity of the defendant's computer and the U.C. Berkeley system by accessing the defendant's computer. In light of the long pendency of this case and government counsel's scheduled unavailability, the United States requests that an evidentiary hearing be held without delay to preserve the June 16, 2008 trial date.

Dated: May 7, 2008                    JOSEPH P. RUSSONIELLO
                                      United States Attorney

                                           /s/
                                      _____
                                      MERRY JEAN CHAN
                                      DENISE MARIE BARTON
                                      Assistant United States Attorneys