JOSEPH P. RUSSONIELLO (CASBN 44332)
United States Attorney

BRIAN J. STRETCH (CABN 163973)
Chief, Criminal Division

MERRY JEAN CHAN (CASBN 229254)
DENISE MARIE BARTON (MABN 634052)
Assistant United States Attorneys

450 Golden Gate Avenue, 11th Fl.
San Francisco, CA 94102
Telephone: (415) 436-6750
Facsimile: (415) 436-6470
Email: merry.chan@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> Plaintiff, <br> v. <br> ERIC MICHAEL BORGERSON, <br> Defendant. | No. CR 07-0472 CW <br><br> DECLARATION OF ROBERT T. HIRAMOTO |

I, Robert T. Hiramoto, hereby declare as follows:

1.  I am the Manager of Information Services and Technology ("IST")/Network Administration at the University of California, Berkeley, Institute for Research on Labor and Employment ("IRLE"), formerly the Institute for Industrial Relations ("IIR"), located at 2521 Channing Way in Berkeley, California. I have held this position since 2004. Until this year, I was the only technician at the building. My supervisor is Hadidjah Rivera, but I am in charge of all technical matters in the IIR building. I have worked in the field of Information Technology ("IT") for approximately twenty years.

2.  The IIR building houses approximately sixty to one-hundred employees, researchers, and students at any given time. Prior to this year, I was responsible for installing every computer at this building and providing technical support. I met with new employees to issue them their work computers. During this initial meeting, I showed each user how to manually lock his computer by logging off. The computers do not automatically lock when left on. When not locked, any person may access the computer. I encouraged each user to lock his computer when away from the machine.

I also told users to contact me about any computer problems, and notified them that I had the ability to access computers remotely. I told users that I routinely used the remote access to conduct maintenance and install software updates on computers, and that I often did this on weekends to avoid interfering with ongoing work during the work-week. Because I could not remotely access a computer unless it was plugged into the building's network and powered on, I asked each user to keep his computer on during weekends. I can remotely shut off computers but can not turn them on remotely. I explained that when I logged onto a computer, a window notifying my presence would pop up on the screen, so an employee using the computer at the time would know that I was also on the computer. If the user then shut down the computer, my access would be cut off. An employee would know that I had been on his computer while he was away because the log-in screen would show the administrator or an administrative CalNet id such as "!Robert-Admin-OA" in the user name field instead of his user name.

I also told each user that he could store private files in a personal folder set up for him on the server in the Z drive. I was not authorized to access these folders without consent from the user or his manager.

3.  I specifically recall meeting with Eric Borgerson when he began working in the California Public Employee Relations ("CPER") program of the IIR. I issued him a laptop computer for his work. In addition to the information I give to all new employees, I told him that I had given him administrative rights to his computer so that he could install programs to make his laptop compatible with peripherals such as his home printer, should he take his computer home to do work.

4.  Although I am not a security specialist, it is also my responsibility to help ensure

1  network security. There are no specific or written organizational guidelines for how I am to monitor
2  for and investigate potential security breaches.

3      5.    The University of California has a superior network system, much faster and more
4  powerful than networks that private individuals can usually obtain. That is one reason why the
5  University's network is particularly attractive to hackers. The network in the IIR building also
6  contains private and protected data. On September 1, 2004, the U.C. Berkeley Systems and Network
7  Security group discovered that a computer in my building had been hacked into, and that a large
8  amount of data containing information protected under California Senate Bill 1386 was stolen. At
9  the time, it was the biggest data theft under SB 1386 to date. Through investigation, it was believed
10 that the hacking had occurred in early August, days after I was first hired to the IIR IT Manager
11 position and before I was operational. Because of this theft, I was particularly vigilant about network
12 security.

13     6.    As a way to detect and prevent security breaches, I review bandwidth usage reports
14 on a daily basis, and have done so since a few weeks after the data theft was discovered in September
15 2004. The bandwidth usage report I use was created by a former U.C. Berkeley employee named
16 Mike Hunter. The report is generated once a day at midnight, and emailed to me. The report shows
17 me the level of data usage by the computers in the IIR building, by computer, in descending order.

18     7.    The first column of the bandwidth usage report is labeled "host" and identifies the
19 particular computer. Computers in my building have static numerical IP addresses. Borgerson's
20 work laptop had an IP address of 128.32.94.9. Sometimes, a computer is listed under the "host"
21 column by this numerical IP address. A computer may also be listed under the "host" column by its
22 associated name. In my building, the associated name is generally the name of the physical data jack
23 or connection in the building to which the computer is assigned. For example, Borgerson's laptop
24 was assigned to jack number two in Office 210 in the IIR building. That jack's name is c2521-210-
25 2.IIR, which stands for 2521 Channing Way, Office 210, jack number two, in the IIR building.
26 Therefore, my understanding is that the bandwidth usage report refers to Borgerson's computer under
27 the name c2521-201-2.IIR even when the computer is not actually plugged into the eponymous jack.
28 Generally, because computers in the IIR building are desktop computers, they are never removed

1  from their assigned jack. Borgerson's computer, however, was a laptop and therefore portable.

2      8.    The second column of the bandwidth usage report is labeled "Known Port" and lists the top ten ports from or to which data has traveled. Each computer has 65,535 ports. Each port is a connection by which a computer may "talk" to another computer over the Internet. Some ports are standardized. Port number 80, for example, is generally standardized for the web site traffic. So, for example, if I see that number 80 listed under "Known Port," for a particular computer, it suggests that that computer was accessing a website.

    9.    The last column of the bandwidth usage report is labeled "T-O," which represents total amount of data in bytes. An entry of 156M would indicate that 156 megabytes of data had traveled over a particular port of a particular computer on the day of the report. The cumulative amount of bandwidth a particular computer has used in a day is the sum of all the "T-O" entries for that computer.

    10.    There are several other columns in the bandwidth report, but I do not refer to them. I typically review only the first few pages of the bandwidth usage report which show the highest data users, and only review the first two and last columns of the report. I use the bandwidth usage report to monitor for any abnormalities in the usage patterns for the IIR building. What may be normal in terms of bandwidth use and the types of ports being used for another building may be out of the ordinary for the IIR building. What may be normal for one day, given what I know to be happening in the building, may be abnormal on another day. Abnormalities require investigation because they may be caused by hackers, viruses, or other breaches to network security.

    11.    On the afternoon of Saturday, October 28, 2006, I was working from home and reviewed the IIR building bandwidth usage report generated for Friday, October 27, 2006. An entry showing that the second highest data user, computer c2521-210-2.IIR had received a large amount of data through port 6346, which is associated with gnutella, caught my eye. Gnutella, abbreviated on the report as "gtela," is a peer-to-peer file sharing network. I knew that computer c2521-210-2.IIR was Borgerson's work-issued laptop, and that I had given Borgerson administrative rights to install programs on the computer. I also knew that file-sharing programs could be used for legitimate purposes. However, I was not aware of any employee in the IIR building using file-sharing for work.

4

1  More importantly, I had never before noticed file-sharing on any of the high-usage hosts in all of the
2  daily bandwidth usage reports I had reviewed. Therefore, this abnormal entry concerned me. I was
3  primarily worried that protected information covered under SB 1384 might be being shared out, or
4  that a hacker had hi-jacked the computer for his or her own purposes. I felt that further investigation
5  was a matter of great urgency and recall telling my wife that this could not wait.

6       12.   To investigate further, I connected my home computer to my work computer which
7  has a remote access program called DameWare, and remotely connected to computer c2521-201-
8  2.IIR. My purposes in accessing Borgerson's computer were to confirm that the computer was file-
9  sharing, ensure that protected data was not being shared out, and check for evidence that the file-
10 sharing was the result of computer hacking or virus. If it had been during the work day, when both
11 Borgerson and I were at work, I probably would have called Borgerson first or physically gone to
12 his computer to conduct my diagnostics. I did not have Borgerson's or his supervisor's non-work
13 contact information.

14       13.   When I tried to access Borgerson's computer using DameWare, I found that
15 Borgerson had left it connected to the network and powered on. Moreover, I found that Borgerson
16 was logged on to the computer. Normally, when a user logs off of his computer but leaves the
17 computer on, I am able to access it through my administrator log-on. This does not permit me to see
18 the user's desktop, but I am still able to access and examine the computer. In this case, because
19 Borgerson had never logged off, I saw his desktop. In statements I made in October 2006, I indicated
20 that as I accessed Borgerson's computer, I immediately saw on his desktop files whose names
21 suggested that the contents were of child pornography. At this time, I have no independent
22 recollection of that.

23       14.   I checked the listing of programs on the computer to see if there were any file-sharing
24 programs. As I scanned the list of programs, I saw BearShare, which I know to be a file-sharing
25 program that has no affiliation with U.C. Berkeley. The list of programs does not alphabetize
26 automatically, and generally, the more recently downloaded programs are listed last. I noticed that
27 BearShare appeared near the bottom of the list, and so surmised that it must have been recently
28 downloaded to the computer.

15. I saw no evidence from the desktop of any file-sharing program currently in use, but I know that some file-sharing programs can hide their existence even while running. I clicked on the BearShare program icon to see if I could make the program appear. Clicking on the program would also cause it to open even if it were not running. The program appeared very quickly, leading me to believe that the program had been running in a hidden mode. I saw a screen with a list of file names "queued" or ready to be downloaded. The icons of these files as well as their file names indicated that they contained images. The file names, such as "9 year old rape" indicated that the contents were of child pornography. I noted that no protected information from the IIR appeared to be being shared out, but the fact that child pornography was being downloaded concerned and perplexed me greatly. I know that child pornography is illegal.

16. Although I knew that Borgerson had the ability to install programs to his work laptop, I considered that perhaps he had not downloaded the BearShare software, and that the file-sharing had been inadvertently triggered by a virus or some malicious program. Evidence of a virus might be of a file named something like Joke.exe, which when opened might unleash a self-executing virus, and which Borgerson might have received as an attachment to an email. One of the danger of such a virus is that other users might be receiving and activating it also, and the entire server would eventually be affected. I therefore went to the computer's list of Recent Documents. I did not see any such document. I did, however, see files with names suggesting more child pornography. I right-clicked on the file for its properties to see where it was stored. I did this because I intended to report the possible security breach to the security specialists on campus and they would need some direction as to where to find the problematic files. The file was saved in a directory on the hard drive: C:\windows\xerxes.

17. I then went to the xerxes directory to see whether other inappropriate files or malicious programs had been stored there. This would help me to ascertain the magnitude and maturity of the problem, to relay to the campus computer security specialists. In the xerxes directory, I saw numerous video files with names indicating child pornograpy, and sub-directories with names indicating the same. When I clicked on one of these sub-directories, I saw thumbnails or pictures of files. I saw what appeared to be children. I do not recall opening any files, but I may tried to do

6

so or actually done so to confirm that files really contained what their titles indicated. I have an upsetting memory of a naked male adult in a shower with a small naked child.

18. I decided that I must shut down the computer, even at the cost of sacrificing further investigative and diagnostic data. However, I first took a few screen shots to document what I had seen. I then shut down the BearShare program, logged off the current user, and shut down the machine. I did not shut Borgerson's computer off sooner because I wanted to collect diagnostic data to give to the security specialists, and sometimes, shutting a computer off may cause this data to disappear. This data may be valuable for diagnosing and preventing system-wide threats. Generally, I do not consider it appropriate to shut down an employee's computer or to disconnect it from the network without some investigation confirming danger or notice to the employee because this may unnecessarily interfere with on-going work. For example, if Borgerson had been in the middle of composing a document and I shut down his computer before he had saved it, his work would have been lost.

19. Because I was working from home on October 28, 2006, the quickest way for me to shut off Borgerson's computer was to access it remotely, and shut it off through the start menu. Alternatively, I could have gone to the IIR building to track down his computer down and shut it off manually. Disconnecting Borgerson's computer from the U.C. network would have required me to physically remove the computer's cable from its data connection. I did not have the technical ability and resources to isolate and close off the ports used for Gnutella on Borgerson's computer, or to limit the bandwidth allocation to Borgerson's computer. Even if I had, I would not have done so without first confirming that his computer was running a file-sharing program and that the program was either being used for illegitimate purposes or had been installed by a hacker. I am neither authorized or able to unilaterally suspend a user account.

20. Based on the diagnostic measures I had taken, I was by now fairly certain that the file-sharing was not the result of a system-wide threat, and was isolated to Borgerson's computer. I was conflicted about reporting the evidence of child pornography, which I knew to be a crime, because I believed that there might be serious consequences to Borgerson. I had never encountered child pornography before, was very upset, and not sure whether I should report to the security specialists

or directly to the police or my supervisor. I decided to contact the campus network security personnel. On Sunday, October 29, 2006, I called Jake Harwood, a security staff member, on his cell phone. His cell phone number was displayed on his web contact page. He told me that he would call the Univeristy of California Police, and that I should cooperate with them.

2521 - RH

21.   On Sunday, October 29, 2006, I accompanied police to the building at ~~2421~~ 2521 Channing Way to provide them with Borgerson's computer. We went to Borgerson's office, room 210, but did not see the computer there. I then checked several other offices before locating the laptop in office 217, which was locked at the time. I have a master key which allows me to open any of the locked office doors in the IIR building. There were normally two desktop computers in office 217. One of them had been disconnected from its data connection, and Borgerson's computer was plugged into this connection.

22.   Subsequently, I learned that Borgerson claimed that I had violated his privacy by looking at his work computer. The U.C. Berkeley Human Resources department contacted me and told me that there would be an internal investigation into the propriety of my actions. I was informed that if my actions were found to violate University policy, I would be disciplined and could be fired. For about a month, I received almost daily phone calls about my examination of Borgerson's computer. I helped to draft an explanation of what actions I had taken with respect to Borgerson's computer in support of a request for post-authorization for access without consent that my supervisor believed it would be prudent to file. I conferred with Karen Eft, the U.C. Berkeley Electronic Communication Policy Coordinator, about whether any of my actions had violated University policy.

23.   I understand this declaration is being submitted in connection with Borgerson's motion to suppress. Accordingly, this declaration is limited to some facts concerning this motion.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of knowledge and belief.

Dated: May 7th, 2008

ROBERT T. HIRAMOTO

8