1 | BARRY J. PORTMAN
Federal Public Defender
2 | ANGELA M. HANSEN
Assistant Federal Public Defender
3 | 555 - 12th Street, Suite 650
Oakland, CA 94607-3627
4 | Telephone: (510) 637-3500

5 | Counsel for ERIC BORGERSON

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | No. CR-07-0472 CW |
|---|---|---|
| Plaintiff, | ) | DEFENDANT'S REPLY RE: MOTION TO SUPPRESS AND REQUEST FOR EVIDENTIARY HEARING |
| vs. | ) | |
| ERIC BORGERSON, | ) | Date: May 14, 2008 |
| Defendant. | ) | Time: 2:30 p.m. |
| | ) | Court: Honorable Claudia Wilken |

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    Mr. Borgerson's expectation of privacy in his laptop computer was both subjective and reasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        1.    Mr. Borgerson demonstrated a subjective expectation of privacy in the contents of his laptop computer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        2.    Mr. Borgerson's expectation of privacy in the contents of his laptop was reasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B.    The search of Mr. Borgerson's laptop was unreasonable both in its inception and in its scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        1.    The government has not carried its burden of establishing that Hiramoto was justified in searching Mr. Borgerson's laptop . . . . . . . . . . . . . . . . . . . . . . . . . 10

        2.    Even if Hiramoto were justified in accessing and searching Mr. Borgerson's laptop, the government has not established that the search was reasonable in scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# TABLE OF AUTHORITIES

*Leventhal v. Knapek*, 266 F.3d 64 (2d Cir. 2001) .................................. 7-9

*Muick v. Glenayre Electronics*, 280 F.3d 741 (7th Cir. 2002) ............................ 8

*United States v. Angevine*, 281 F.3d 1130 (10th Cir. 2002) ............................. 8

*United States v. Bailey*, 272 F. Supp. 2d 822 (D. Neb. 2003) ............................ 9

*United States v. Barrows*, 481 F.3d 1246 (10th Cir. 2007) ............................. 5

*United States v. Greiner*, 235 Fed. Appx. 541 (9th Cir. 2007) .......................... 8

*United States v. Heckenkamp*, 482 F.3d 1142 (9th Cir. 2007) ....................... 7, 15

*United States v. Slanina*, 283 F.3d 670 (5th Cir.),
    *vacated on other grounds*, 537 U.S. 802 (2002) .............................. 5, 8

*United States v. Simons*, 206 F.3d 392 (4th Cir. 2000) ................................ 8

*United States v. Thorn*, 375 F.3d 679 (8th Cir. 2004),
    *remanded in light of Booker*, 543 U.S. 1112 (2005) ............................. 8

*United States v. Ziegler*, 474 F.3d 1184 (9th Cir. 2007) ............................... 5

**INTRODUCTION**

Mr. Borgerson has moved to suppress all fruits of the warrantless search of his work-issued laptop computer. The government has opposed the motion, arguing that Mr. Borgerson had neither a subjective nor a reasonable expectation of privacy in the laptop computer and that the search was reasonable. For the reasons discussed below and in the memorandum in support of his motion to suppress, Mr. Borgerson submits that the government is wrong. If the Court does not grant his suppression motion on the papers, it must hold an evidentiary hearing.

**BACKGROUND**

Many of the relevant facts are not now in dispute. The government does not dispute that the Fourth Amendment applies to the search of Mr. Borgerson's work-issued computer by employees of the University of California, Berkeley ["UCB"]. United States's Opposition to Defendant's Motion to Suppress and Request for Evidentiary Hearing ["US Opp."] at 10. The government does not dispute that Hiramoto's remote access of Mr. Borgerson's computer was a search or that it was conducted without a warrant. US Opp. at 15.

The government does not dispute that the bandwidth report that started Hiramoto's investigation indicated that Mr. Borgerson's computer was file-sharing. US Opp. at 6, 15. The government agrees that file-sharing is neither illegal nor against UCB policies.[1] Declaration of Robert T. Hiramoto ["Hiramoto Decl."] ¶ 11. Based on Hiramoto's declaration, the government does not now dispute that Hiramoto did not see any indication of child pornography until after he saw that the BearShare file-sharing program had been installed on Mr. Borgerson's laptop and, in

---

[1] The government claims that "only faculty and students at U.C. Berkeley were permitted to use file-sharing for personal purposes, and the defendant was neither." US Opp. at 15. At the time he began searching Mr. Borgerson's computer, Hiramoto did not know whether the file-sharing was for personal purposes. Moreover, even if it were against UCB policy for Mr. Borgerson to be file-sharing, the Electronic Communications Policy prohibits systems personnel from "intentionally search[ing] the contents of electronic communications or transactional information for violations of law or policy." Exhibit P, Bates 68. Thus, whether or not Mr. Borgerson was in fact file-sharing for personal or work purposes is not relevant here.

BORGERSON, CR 07-0472 CW
REPLY RE: MOTION TO SUPPRESS         1

fact, until after he *opened* the BearShare program.[2] US Opp. at 7; *see also* Hiramoto Decl. ¶¶ 13-15 (Hiramoto says he no longer recalls seeing indications of child pornography on desktop and confirms that he did not see any file names suggesting child pornography until after he opened BearShare).

What remains critically in dispute is Hiramoto's reason for remotely accessing and searching Mr. Borgerson's laptop. In his initial statements, Hiramoto clearly said that he searched Mr. Borgerson's laptop to determine whether he was file-sharing; this was the only reason he gave for the search. Exhibit C. Now, however, Hiramoto says he was concerned about protected data being transferred out through the laptop, and he was concerned about hackers and viruses. Hiramoto Decl. ¶ 12. As discussed below, his newly minted justifications for the search are not credible in light of both his earlier statements and the actions he took.

Hiramoto remotely accessed Mr. Borgerson's laptop computer based on a bandwidth report that, itself, does not support his asserted justifications. His actions in accessing and searching the laptop do not comport with either UCB policies or the workplace exception to the Fourth Amendment for warrantless searches. Hiramoto's very invasive search of the contents of Mr. Borgerson's laptop went far beyond what was necessary to allay any security concerns. For these reasons, the Court should grant Mr. Borgerson's motion to suppress all fruits of the

---

[2] In at least one of the three reports, Hiramoto claimed that as soon as he accessed the laptop he saw indications of child pornography on the desktop, before he located the file-sharing program. *See* Exhibit C to Defendant's Motion. This claim was made the day after the search when Hiramoto's memory was fresh. In his declaration, Hiramoto now says that he has "no independent recollection" of seeing child pornography on the desktop. Hiramoto Decl. ¶ 13. For the government to attribute Hiramoto's retraction to a memory lapse is troubling. Hiramoto's original justification to continue his search–that he saw pornography in plain view on the desktop–were it accurate, could have been verified through a forensic examination of the laptop. To the extent the government has already verified that Hiramoto could not have seen what he claimed he saw when he first accessed Borgerson's desktop, those reports should have been produced to the defense. Because no such reports have been turned over, Mr. Borgerson plans to seek leave from the Court to file supplemental evidence following a defense examination of the laptop, which is presently scheduled for May 22, 2008. This examination is likely to reveal evidence relevant to Hiramoto's credibility.

BORGERSON, CR 07-0472 CW
REPLY RE: MOTION TO SUPPRESS                         2

warrantless search or, at a minimum, conduct an evidentiary hearing so that Hiramoto can be questioned under oath regarding his shifting justifications for the search.

**A.    Mr. Borgerson's expectation of privacy in his laptop computer was both subjective and reasonable.**

   **1.    Mr. Borgerson demonstrated a subjective expectation of privacy in the contents of his laptop computer.**

The government argues that Mr. Borgerson "did not demonstrate a subjective expectation that his activities in his work computer would be private." US Opp. at 10. In support of its argument, the government cites the following facts: (1) Mr. Borgerson did not turn off the power to the laptop; (2) he did not log out of the laptop; (3) he left the laptop in a colleague's locked office, for which he had not been issued a key; and (4) he saved files on the hard drive of his computer, "which he knew the system administrator could access." US Opp. at 10-11. These facts, even if true, do not diminish Mr. Borgerson's subjective expectation of privacy in his laptop computer.

The laptop computer was issued to Mr. Borgerson; he did not share it with any other employee. Hiramoto Decl. ¶ 3, Exhibit B, Bates 16. As Hiramoto acknowledged, he gave Mr. Borgerson "administrative rights to his computer[,] meaning he could install programs." Hiramoto Decl. ¶ 3, Exhibit A, Bates 97. Mr. Borgerson did not turn off the power to his laptop computer because Hiramoto had instructed him "to keep his computer on during weekends." Hiramoto Decl. ¶ 2. Although Mr. Borgerson was not logged off late on Saturday afternoon when Hiramoto remotely accessed and searched his laptop, he had been issued a private password for the laptop that he had not shared with anyone.[3] Exhibit B, Bates 16, 25.

By placing the laptop in a locked office that was not his own, Mr. Borgerson actually

---

[3]Under University of California electronic security policies, Mr. Borgerson's laptop should have automatically logged him out, or had some similar security device installed, to minimize the risk of unauthorized access to his computer. *See* IS-3 Electronic Information Security ["EIS"] (Dec. 18, 2007), §§ C.2.b.ii, IV.I (Exhibit S), *available at* http://www.ucop.edu/ucophone/policies/bfb/1s3.pdf (University of California computer security policies). Mr. Borgerson is not responsible for UCB's failure to comply with this policy.

BORGERSON, CR 07-0472 CW
REPLY RE: MOTION TO SUPPRESS                    3

demonstrated his subjective expectation of privacy. The locked office where Mr. Borgerson put the laptop from Friday through the weekend of Hiramoto's search (office 217) provided him with more privacy than his own office. Mr. Borgerson shared his office with another employee and, according to an FBI interview with his boss, he "used other work areas besides his own office *in order to allow more privacy* for either himself, or . . . his office mate." *See* FBI Interview of Carol Vendrillo, Exhibit T[4] (emphasis added); *see also* FBI Interview of Myra Armstrong, Exhibit U (stating that she would unlock unoccupied offices for Mr. Borgerson to use at his request and with the approval of Vendrillo). He commonly used office 217 for this purpose, Exhibits T, U, which was the office of Katherine Thomson. Exhibit U. Thomson was out of the office at a conference on Friday, October 27, 2006, the day before the search. *See* FBI Interview of Katherine Thomson, Exhibit V.

Moreover, when Mr. Borgerson left the laptop in the locked office, he lowered the laptop screen toward the keyboard so that its content was not visible to passers-by. *See* Supplemental Declaration of Eric Borgerson ["Supp. Borgerson Decl."] ¶ 4. Not only did Mr. Borgerson fold the screen when he left, he left the laptop in a locked office during the weekend when it can be expected that there would be no other (or at least fewer) employees around. *Id.*

The government also argues that Mr. Borgerson failed to demonstrate a subjective expectation of privacy in his work computer because "he knew the system administrator could access" his hard drive.[5] US Opp. at 10. Although Hiramoto says he told users that he "routinely used the remote access to conduct maintenance and install software updates on computers" on

---

[4]Mr. Borgerson submitted Exhibits A through R with his opening motion. For ease of reference, the exhibits, which were filed separately, will begin with Exhibit S.

[5]Mr. Borgerson recalls Hiramoto mentioning a network drive where he could store files that would be backed up and saved, but he does not recall Hiramoto telling him that files stored in this network drive were more protected from access than were files saved directly to his laptop. Supp. Borgerson Decl.¶ 6; *cf.* Hiramoto Decl. ¶ 2 (Hiramoto says he told employees they could store private files on the Z: drive and that he was not authorized to access those files without consent, but he does not say he told Borgerson about limitations on access).

1  weekends, Hiramoto Decl. ¶ 2, he does not say that he ever remotely accessed Mr. Borgerson's
2  laptop before this search. Mr. Borgerson does not recall any indication that Hiramoto ever
3  remotely accessed his laptop. Supp. Borgerson Decl. ¶ 5. Even if Hiramoto had, the government
4  has not explained how such access would entail opening programs and searches of directories and
5  sub-directories inside the computer. *See* Supplemental Declaration of Jeff Fischbach ["Supp.
6  Fischbach Decl."] ¶ 9 ("While routine maintenance may require a systems administrator to
7  occasionally log onto a user's machine, it can usually be accomplished without logging into the
8  user's personal desktop, and it would not normally entail opening programs and searching
9  directories and sub-directories, private or otherwise."). Moreover, as the government
10 acknowledges, UCB's computer policies, at a minimum, do not allow routine inspection of the
11 contents of employees' computers. *See* US Opp. at 3-4.

12     The cases the government cites rely on factors similar to those present here to find a
13 subjective expectation of privacy. Mr. Borgerson's laptop, like the computer in *United States v.*
14 *Slanina*, 283 F.3d 670, 676 (5th Cir.), *vacated on other grounds*, 537 U.S. 802 (2002), was in a
15 locked office that he had official permission to use and that was not being used by any other
16 employee at the time of the search. *See Slanina*, 283 F.3d at 676 (noting that co-workers' access
17 to defendant's office did not defeat expectation of privacy); *see also United States v. Ziegler*, 474
18 F.3d 1184, 1189-90 (9th Cir. 2007) (noting that employees of private employers have some
19 expectation of privacy even in shared offices that is not defeated by existence of master key). Mr.
20 Borgerson had moved his laptop from his shared office to an office that was unoccupied at the
21 time for the purpose of securing more privacy. He also lowered the laptop screen so that it would
22 not be visible to others. *Cf. United States v. Barrows*, 481 F.3d 1246, 1249 (10th Cir. 2007)
23 (finding no subjective expectation of privacy where defendant knowingly networked his personal
24 computer to the city computer for the purpose of sharing files and computer was in a public area
25 where employees and the public passed by all day).

26     In sum, at the time of Hiramoto's remote search of Mr. Borgerson's laptop, on a Saturday

evening, the laptop was in a locked office that Mr. Borgerson was authorized to use to afford him greater privacy than his own shared office. He had folded the laptop screen toward the keyboard, so the screen was not visible to anyone else who might have been in the office at the time. The government now concedes that the incriminating files that Hiramoto viewed were not immediately apparent on the computer desktop. Under these circumstances, Mr. Borgerson had a subjective expectation of privacy in his laptop computer.

### 2. Mr. Borgerson's expectation of privacy in the contents of his laptop was reasonable.

As he argued in his motion, Mr. Borgerson's expectation of privacy also was objectively reasonable. The government contends that Mr. Borgerson did not have a reasonable expectation of privacy because "he knowingly exposed his computer to the public" by leaving it "unlocked and open in someone else's workspace." US Opp. at 11-12. Mr. Borgerson disagrees. It is not unreasonable to expect that the contents of his laptop computer, which was folded down and in a locked office that he was authorized to use and that was not occupied at the time, would remain private.

Nor did UCB's policies or practices defeat Mr. Borgerson's reasonable expectation of privacy. On the contrary, as discussed in Mr. Borgerson's motion, they gave him strong reason to believe the contents of his computer would *not* be inspected. As the government acknowledges, UCB's Electronic Communications Policy ["ECP"] does not prohibit personal use of UCB computers. US Opp. at 3 (citing Exhibit Q at 8). Contrary to the government's claim, UCB policies provide *very* strong privacy protections for computer users:

> The University respects the privacy of electronic communications in the same way that it respects the privacy of paper correspondence and telephone conversations . . . . The University does not examine or disclose electronic communications records without the holder's consent. Nonetheless, subject to the requirements for authorization, notification, and other conditions specified in this Policy, the University may examine or disclose electronic communications under very limited circumstances . . . .

Exhibit Q, IV.A, p.10. In general,

> [a]n electronic communications holder's consent shall be obtained by the University prior to any access for the purpose of examination or disclosure of the contents of University electronic communications records in the holder's possession

Exhibit Q, IV.B, p.10; *see also* Guidelines for Use of Campus Network Data Reports (Exhibit W), *available at* https://security.berkeley.edu/cispc/gdlns.net.data.html (stating that "[d]epartments must exercise great caution to ensure that their uses of the data do not impinge upon the *expectations of privacy* afforded to campus network users by law and policy. . . . If departments determine that it is necessary to examine suspect electronic communications records beyond routine practices, the user's consent shall be sought." (emphasis added)); *accord*, Supp. Fischbach Decl. ¶ 2 (explaining extensive experience drafting and editing electronic communication policies and offering opinion that the privacy policies at issue in this case are "fairly protective of a user's privacy and seem to give more rights to individual users than to the University.").

In fact, the privacy protections afforded by UCB's policies are at least as strong as–and in many cases stronger than–the protections on which courts have relied to find a reasonable expectation of privacy. In *United States v. Heckenkamp*, 482 F.3d 1142, 1147 (9th Cir. 2007), for example, the Ninth Circuit held that a university policy providing that

> "[i]n general, all computer and electronic files should be free from access by any but the authorized users of those files. Exceptions to this basic principle shall be kept to a minimum and made only where essential to . . . protect the integrity of the University and the rights and property of the state"

did not defeat the defendant's expectation of privacy in his computer. "Rather, they establish limited instances in which university administrators may access his computer in order to protect the university's systems." *Heckenkamp*, 482 F.3d at 1147. In *Leventhal v. Knapek*, 266 F.3d 64, 74 (2d Cir. 2001), the Second Circuit found a reasonable expectation of privacy where there was no evidence that the employer routinely searched office computers and the employer's policy did not prohibit personal use of office computers. Although computer staff had access to all office computers, there was no evidence that document searches in unattended computers were frequent,

1 widespread or extensive. *Leventhal*, 266 F.3d at 74. And in *Slanina*, the Fifth Circuit held that a
2 defendant's expectation of privacy in his work computer was reasonable where there was no
3 evidence of computer staff having routine access to his computer and no disseminated policy about
4 monitoring of computer access or use or prohibiting the storage of personal information on
5 computers. 283 F.3d at 676.

6 Where courts have found that employer policies defeated an employee's expectation of
7 privacy, by contrast, the policies have been explicitly much less protective of privacy. In *United*
8 *States v. Simons*, 206 F.3d 392, 398 (4th Cir. 2000), the court found no reasonable expectation of
9 privacy in light of an employer policy that "clearly stated that FBIS would 'audit, inspect, and/or
10 monitor' employees' use of the Internet, including all file transfers, all websites visited, and all e-
11 mail messages, 'as deemed appropriate.'" In *Muick v. Glenayre Electronics*, 280 F.3d 741, 743
12 (7th Cir. 2002), an employee had no expectation of privacy in his work-issued computer where his
13 private employer had a policy of inspecting the laptops it provided for employees. In *United States*
14 *v. Greiner*, 235 Fed. Appx. 541, 542 (9th Cir. 2007) (unpublished), the Ninth Circuit found no
15 legitimate expectation of privacy where the employer had a "warning banner" informing employees
16 every time they logged onto the computer that their computer activity may be monitored and
17 disclosed to law enforcement and that their use of the computer is deemed consent to monitoring
18 and disclosure. In *United States v. Angevine*, 281 F.3d 1130, 1134 (10th Cir. 2002), the court
19 found no reasonable expectation of privacy where the university employer reserved the right
20 randomly to audit employees' Internet use and to monitor employees suspected of misusing
21 computers. The policy also cautioned users that information on the university network and in their
22 work computers was not confidential. *Angevine*, 281 F.3d at 1134. Finally, there was a
23 "splashscreen" that warned of criminal penalties for misuse and of the university's right to inspect
24 computers for business reasons. *Id.* In *United States v. Thorn*, 375 F.3d 679, 682 (8th Cir. 2004),
25 *cert. granted and remanded in light of Booker*, 543 U.S. 1112 (2005), the court found no
26 reasonable expectation of privacy where the state employer's policy explicitly provided for no

1. personal privacy rights in work computers, explicitly prohibited personal use of the computers and
2. required employees immediately to report other employees' improper use of the computer system.
3. And in *United States v. Bailey*, 272 F. Supp. 2d 822, 835-36 (D. Neb. 2003), the district court
4. found no reasonable expectation of privacy where employees were on notice that use of the
5. computer system was consent to monitoring of and authority to search the computer; policies also
6. said that computers could be searched to ensure that employees were not using the employer's
7. computers to violate the law or policies or in a way that reflected negatively on the employer.
8.     These cases make it clear that the UCB policies provided Mr. Borgerson with substantial
9. privacy rights in his laptop computer. Moreover, the very limited access to Mr. Borgerson's
10. laptop computer authorized by the policies did not defeat his reasonable expectation of privacy.
11. Here, as in *Leventhal*, there is

> no evidence that these searches were frequent, widespread, or extensive enough to constitute an atmosphere "so open to fellow employees or the public that no expectation of privacy is reasonable." [citing *O'Connor v. Ortega*, 480 U.S. 709, 718 (1987) (plurality opinion)]. This type of infrequent and selective search for maintenance purposes or to retrieve a needed document, justified by reference to the "special needs" of employers to pursue legitimate work-related objectives, does not destroy any underlying expectation of privacy that an employee could otherwise possess in the contents of an office computer. The Supreme Court has concluded that " '[c]onstitutional protection against *unreasonable* searches by the government does not disappear merely because the government has the right to make reasonable intrusions in its capacity as employer.' " *Id.* at 717-18, 107 S. Ct. 1492 (plurality opinion quoting concurring opinion of Scalia, J.) (emphasis in original).

266 F.3d at 74.

    Nor does Hiramoto's claim that he "routinely used the remote access to conduct maintenance and install software updates on computers," Hiramoto Decl. ¶ 2, defeat Mr. Borgerson's expectation of privacy in his laptop. First, there is a factual issue about whether such access really was "routine": Hiramoto does not say that he ever accessed Mr. Borgerson's computer for these purposes, and Mr. Borgerson does not recall any indication that Hiramoto ever

1  did so.  *See* Borgerson Supp. Decl. ¶ 5; *see also* Hiramoto Decl. ¶ 2 (stating that remote access

2  triggers either a window on the screen, if the user is logged on to computer, or administrator

3  identification at log in if the user was not logged on at the time).  Second, the government offers

4  no evidence about what access for such routine administrative purposes would look like; it seems

5  unlikely that Hiramoto's access for maintenance or installing updates would entail the deep and

6  detailed search he conducted in this case.  *See* Supp. Fischbach Decl. ¶ 9; *cf.* Exhibit Q, Att. 2,

7  III.B.4. (noting that "*automated* inspection of electronic communications in order to protect the

8  integrity and reliability of University electronic communication resources does not constitute

9  nonconsensual access" (emphasis added)).  As Hiramoto himself acknowledged, there was nothing

10 routine about his search of Mr. Borgerson's computer.  *See* Exhibit A (Hiramoto recalled only one

11 other time that he accessed an IIR employee's computer to investigate high bandwidth); *see also*

12 UC Berkeley Forms for Authorization of Non-consensual Access to Electronic Communications

13 Records and Memorandum in Support, Exhibit X, page 3, Bates 293 (newly disclosed UC

14 Berkeley Memorandum in support of post-hoc approval of Hiramoto's actions noting that

15 Hiramoto "began an *investigation*" of Borgerson's computer based on an October 27, 2006

16 bandwidth report) (emphasis added).

17       For these reasons, and the reasons set forth in the memorandum in support of his motion to

18 suppress, Mr. Borgerson had a reasonable expectation of privacy in the contents of his laptop

19 computer.

20 **B.    The search of Mr. Borgerson's laptop was unreasonable both in its inception
         and in its scope.**

21
       **1.    The government has not carried its burden of establishing that Hiramoto was
22            justified in searching Mr. Borgerson's laptop.**

23       The government argues, based on Hiramoto's new declaration, that, after reviewing the

24 bandwidth report, Hiramoto was justified in accessing and searching Mr. Borgerson's computer

25 "to confirm that the computer was file-sharing, ensure that protected data was not being shared

26 out, and check for evidence that the file-sharing was the result of computer hacking or virus."

BORGERSON, CR 07-0472 CW
REPLY RE: MOTION TO SUPPRESS                      10

1  Hiramoto Decl. ¶ 12.  The first problem with the government's argument is that Hiramoto's newly
2  asserted justification for the search is not consistent with his initial explanation for the search.
3  Hiramoto's October 29, 2006, signed statement, made the day after the incident, makes no
4  mention whatsoever about concerns of losing protected data, hacking or viruses.  Exhibit C.
5  Instead, Hiramoto said only that he "was curious to see if [Mr. Borgerson's] machine was running
6  a file sharing program."  *Id.*  The bandwidth report itself identified the port as being a file-sharing
7  port, Hiramoto Decl. ¶ 11; Hiramoto thus had no need to search Mr. Borgerson's laptop "to
8  confirm that the computer was file-sharing."  Exhibit B, Bates 16; Exhibit C, Bates 18.

9       Hiramoto's new justification also is not consistent with his conduct during the search of
10 Mr. Borgerson's laptop.  Hiramoto said in his 2006 statement that after he accessed the computer
11 and found the file-sharing program, he "decided to run the BearShare program that was installed,
12 to see if that would let [him] see if any file sharing programs were currently sharing files."  *Id.*  If,
13 as he now says, he was concerned that protected data was being shared out through the file-
14 sharing program, Hiramoto Decl. ¶ 12, he would not have "run the BearShare program that was
15 installed."  Exhibit C.  Doing so could have triggered the out-flow of protected data that Hiramoto
16 said he was concerned about.  Instead, Hiramoto should have shut down the laptop.

17      Hiramoto's new statement that he was concerned about protected data being shared out
18 also is belied by the bandwidth report itself.  According to the report, the *incoming* traffic for the
19 "gtela" port Hiramoto was concerned about (56.6M, or megabytes) was twenty-eight times greater
20 than the *outgoing* traffic for that port (2010K, or kilobytes).  *See* Supp. Fischbach Decl. ¶ 5.  "This
21 indicates that more data was being downloaded–not uploaded–through the file-sharing port."  *Id.*
22 Thus, Hiramoto did not need to search Mr. Borgerson's laptop to determine that traffic from the
23 file-sharing port was flowing primarily into Mr. Borgerson's computer, rather than out from it.  *Id.*

24      Mr. Borgerson argued in the memorandum in support of his motion that the amount of data
25 associated with the gtela port on which Hiramoto relied was small.  Hiramoto now says that, based
26 on his experience with IIR, it was both file-sharing and the amount of data associated with the

filing-sharing port that seemed "abnormal" to him. Hiramoto Decl. ¶ 11. A document which appears to explain the UCB bandwidth report relied upon by Hiramoto, which the government produced for the first time last week, suggests that Hiramoto's claimed concerns are not well-founded. This document provides examples of what would appear on a bandwidth report if a user were file-sharing, and what the report would look like if the system were compromised by a hacker. *See* document entitled "Departmental Bandwidth Usage Reports," Exhibit Y.[6] Significantly, the section of the document given as an example of a hacking incident looks nothing like so-called abnormal pattern on the bandwidth report in this case. *Id.*; *see also* Supp. Fischbach Decl. ¶ 3. The bandwidth pattern at issue here does resemble the file-sharing (kazaa) example, but the amount of bandwidth in the example is significantly greater than the bandwidth that Hiramoto says was suspicious in this case. *See* Supp. Fischbach Decl. ¶ 3. In fact, the large amount of data Hiramoto suggested was abnormal (56.6M) "does not come close to the University's own example for a high-usage pattern" (2504M and 1246M). *Id.* ¶ 4 (*comparing* Exhibit Y, page 2 *with* October 27, 2006, bandwidth report, Exhibit D, Bates 216). Moreover, this example confirms what Hiramoto should have deduced from the bandwidth report, that the "user has installed [file-sharing," and that file-sharing "does not violate [UCB] policy in and of itself." Exhibit Y, page 2.

In his April, 2007, statement to the FBI, Hiramoto for the first time stated that he searched Borgerson's laptop given his concern that "the building's computer network had been compromised."[7] Exhibit A. He said in this statement that it was merely the presence of high

---

[6] The document the government produced (Bates 287-289) cuts off the wording at the right margin. Mr. Borgerson located and submitted as Exhibit Y an Internet version of the same document.

[7] An undated Memorandum, which was disclosed to the defense for the first time last Wednesday, also states as a basis for the search that "a large amount of data being transferred to and from high numbered, unallocated ports . . . can be indicative of system compromise." *See* Exhibit X, page 3. This Memorandum apparently was prepared by IIR as part of an after-the-fact request, pursuant to the ECP, to approve Hiramoto's non-consensual access to Mr. Borgerson's laptop computer. *See* Declaration of Karen Eft ["Eft Decl."] ¶ 10; Hiramoto Decl. ¶ 22. Notably, this action was taken after Mr. Borgerson was arrested and complained to UCB that his privacy

1  bandwidth that caused this concern, with no reference to file-sharing.[8] *Id*. Hiramoto now makes

2  the same claim with the added reference to file-sharing. But Hiramoto's claimed fear that the

3  building's computer network had been compromised by so-called high-usage file-sharing is

4  unfounded. High-bandwidth usage through a file-sharing port ("gtela") has little bearing on the

5  likelihood that the system would be compromised by a hacker or a virus. Supp. Fischbach Decl. ¶

6  8. "All this suggests is that the user is downloading large media files." *Id.*

7      Hiramoto's claim that he feared that "file-sharing had been inadvertently triggered by a

8  virus or some malicious program" is similarly unfounded. Hiramoto Decl. ¶ 16. Searching

9  Borgerson's laptop for evidence of a hacker was an unreasonable response to this alleged fear

10 given Hiramoto's admission that Borgerson was sophisticated enough to install his own software

11 and had permission to do so. *Id.* It was also unreasonable because there was no real threat. On

12 the one hand, file-sharing poses a risk that a shared file may have a virus and infect a system, but

13 the risk is no greater than the risk associated with email. Supp. Fischbach Decl. ¶ 6. On the other

14 hand, "it would be illogical for a hacker or a virus to surreptitiously install file-sharing software for

15 the purposes of downloading files *to* a user's machine, as Hiramoto claims . . . . It's the equivalent

---

rights had been violated. Supp. Borgerson Decl. ¶ 7; Hiramoto Decl. ¶ 22.

Moreover, the Memorandum includes several misstatements, including the date of Hiramoto's investigation (it was Saturday, October 28, not Sunday October 29, 2006, and the statement that the port Hiramoto was concerned about was "unallocated" when, in fact, Hiramoto knew that the port was a recognized file-sharing port. *See* Hiramoto Decl. ¶ 11 (stating that port 6346 "is associated with gnutella"). Also, the rationale, under the ECP, for the non-consensual access without prior authorization is not consistent: The Memorandum states that Hiramoto's access was proper under the "Time-dependent, Critical Operational Circumstance" provision of the ECP but the request for after-the-fact authorization cites a different ECP category, "Compelling Circumstances" *See* Exhibit X, pages 1-2 (Forms for Authorization of Non-consensual Access to Electronic Communications Records); *see also* Ex. Q, Appendix A (defining "compelling circumstances" and "time-dependent, critical operational need").

[8]If Hiramoto truly were concerned about high bandwidth usage, it seems odd that he did not investigate other hosts identified on the bandwidth reports as using even more bandwidth than Mr. Borgerson. *See* Exhibit D (displaying one host with greater total bandwidth usage than Mr. Borgerson and numerous ports with greater bandwidth usage than Mr. Borgerson's gtela port).

1  of a pickpocket putting money into a victim's wallet.  It's possible, but not likely to happen."  *Id.*

2  Hiramoto suggests that this "clever virus" might have entered Borgerson's computer

3  through his email, triggering the file-sharing program.[9]  Supp. Fischbach Decl. ¶ 7; Hiramoto Decl.

4  ¶ 16.  But if Hiramoto truly were concerned that Mr. Borgerson might have received a virus

5  through an email attachment, he could have–without violating Mr. Borgerson's privacy

6  rights–logged onto UCB's email server to check for a virus.[10]  Supp. Fischbach Decl. ¶ 7.

7  The government asserts that "Hiramoto's actions were 'purely within the scope of his role

8  as a system administrator,' and authorized by the U.C.'s computer use policies."  US Opp. at 16.

9  In fact, they were not.  Without consent, prior authorization or very limited emergency

10 circumstances, the ECP allows only "*routine* monitoring of electronic communications" and the

11 *inspection of network traffic* "to confirm malicious or unauthorized activity that may harm the

12 campus network or devices connected to the network."  Exhibit Q, V.B, p.15 (emphasis added).

13 Hiramoto's search of Mr. Borgerson's laptop was neither routine nor limited to an inspection of

14 network traffic, nor did Hiramoto stop searching the contents of Mr. Borgerson's laptop when he

15 saw the BearShare program.  Although the Computer Use Policy allows system administrators to

16 access or examine files or accounts that are suspected of unauthorized use or misuse or that have

17 been corrupted or damaged, they are required to "follow[] organizational guidelines" in doing so.

18 Exhibit O, Bates 79.  Hiramoto's claim that "[t]here are no specific or written organization

19 guidelines for how [he is] to monitor for and investigate potential security breaches," Hiramoto

20 Decl. ¶ 4, ignores the ECP, the Cal Mail Policy and numerous other UC policies related to the use

---

22 [9] Hiramoto's declaration cites to an example, Joke.exe, which he says is "a self-executing virus, and which Borgerson might have received as an attachment to an email."  Hiramoto Decl. ¶ 16.  But Joke.exe is an "email-related virus that doesn't appear to have anything to do with file-sharing."  Supp. Fischbach Decl. ¶ 6.

25 [10] University of California computer systems are required to have firewalls and protection from malicious software.  EIS [secs.] IV.D, F.  According to the EIS, security controls against malicious programs, such as viruses, consist of "anti-virus, anti-spyware software, and firewalls."  *Id.* Appendix C.

BORGERSON, CR 07-0472 CW
REPLY RE: MOTION TO SUPPRESS                    14

1  of electronic communications and devices. *See, e.g.*, Exhibit Q, III.B.4. (stating that employees
2  must comply with provisions of ECP setting forth "the conditions under which they may observe
3  the contents of electronic communications or transactional information"; Exhibit S, EIS §§ C.2.c.i.
4  (University of California computer security policies stating that systems administrators must follow
5  all UC policies and that "[p]rocedures for action in response to security incidents and other
6  emergency events should be documented and communicated to support personnel.").

7  The government suggests that Hiramoto's actions here were justified because they were
8  comparable to those of the systems administrator in *Heckenkamp*. US Opp. at 16. In that case, it
9  was determined that there had been an unauthorized intrusion–a hacker–into the computer
10 networks of both a corporation and a university. *Heckenkamp*, 482 F.3d at 1143. A university
11 systems administrator first investigated the university's email server and traced the intrusion to the
12 defendant. *Id.* at 1144. Even then, in the face of an actual intrusion, the systems administrator did
13 not search the defendant's computer; instead, "[i]n order to protect the university's server, [he]
14 electronically blocked the connection between [the defendant's IP address] and the mail server. *Id*.
15 When the systems administrator learned that the same user had again logged onto the system with
16 a different IP address, he *still* did not search the defendant's computer. *Id.* at 1144-45. Instead,
17 he found the computer, physically disconnected it from the network, obtained the password from
18 the defendant and used the password only to "verify[] that it was the computer used to gain the
19 unauthorized access." *Id.* at 1145. On these facts, the Ninth Circuit affirmed the district court's
20 determination that the search of the defendant's computer was justified. *Id.* at 1147-48.

21 This case is distinguishable from *Heckenkamp*. In *Heckenkamp*, there was no doubt that
22 there had been an actual security breach in two computer networks, and the system administrator's
23 initial, non-intrusive attempts to block the defendant's access to the networks had failed. Both the
24 reality and exigency of the threat and the relatively non-intrusive steps the systems administrator
25 took in *Heckenkamp* set it apart from this case.

26 Finally, Hiramoto's entry into and search of Mr. Borgerson's laptop was not a reasonable

1 response to the security threats to which he claims to have been responding. The bandwidth report
2 itself told Hiramoto that the bandwidth was caused by file-sharing and that more data was flowing
3 *into* the port than out from it. Supp. Fischbach Decl. ¶¶ 5-6 (explaining that "virus and hacking
4 concerns typically surround the theft of data"). As Mr. Borgerson noted in the memorandum in
5 support of his motion, because they operate covertly, remotely accessing and searching Mr.
6 Borgerson's computer would not have told Hiramoto whether or not a virus was present. *Id.* ¶ 7.

For the reasons discussed above, Hiramoto was not acting out of concern for the security
and integrity of the computer network. Rather, as he initially stated, he was "curious to see if [Mr.
Borgerson's] machine was running a file sharing program." Exhibit C. Because file-sharing is not
illegal, prohibited by UCB policies or either inherently or in this instance a threat to the university's
network, the government has not established that Hiramoto was justified in remotely accessing and
searching Mr. Borgerson's laptop.

### 2. Even if Hiramoto were justified in accessing and searching Mr. Borgerson's laptop, the government has not established that the search was reasonable in scope.

The government contends that Hiramoto's search was reasonable in scope because he
searched Mr. Borgerson's computer only to "diagnos[e] any security breach that had occurred"
and "secur[e] the network." US Opp. at 16, 17. Mr. Borgerson discussed above why Hiramoto's
new justifications for searching Mr. Borgerson's computer simply are not credible and why the
steps he took are not consistent with his now-asserted justifications. In short, the bandwidth
report itself established that there was file-sharing and that data primarily was being transferred to,
not from, Mr. Borgerson's computer, *id.* at 16; Hiramoto could not have identified a virus by
remotely searching Mr. Borgerson's computer, *id.* at 17; opening BearShare, once Hiramoto found
it, was not likely to reveal any useful information, *id.* at 16; and had Hiramoto had real security
concerns, he could and should have shut down Mr. Borgerson's computer.[11] *Id.* at 18. In the

---

[11] Hiramoto stated in his declaration that he is "neither authorized nor able to unilaterally suspect a user account." Hiramoto Decl. ¶ 19. Under the ECP, however, systems administrators

memorandum in support of his motion and above Mr. Borgerson also has addressed the government's argument that the scope of Hiramoto's search was consistent with UCB policies. US Opp. at 17-18.

Even if Hiramoto was justified in remotely accessing Mr. Borgerson's computer, he exceeded the scope of any justification when he opened the BearShare program.  There was nothing legitimately related to the security of the network that he could have learned by opening BearShare on Mr. Borgerson's laptop computer.  Had Hiramoto still had legitimate security concerns after he observed BearShare on Mr. Borgerson's laptop, what he should have done–to remain within the bounds of UCB policies and the Fourth Amendment–was turn off the computer.

## CONCLUSION

For the reasons stated above and in the memorandum in support of his motion, the Court should suppress all fruits of the warrantless search of Mr. Borgerson's work-issued laptop computer.  Alternatively, the Court should hold an evidentiary hearing.

Dated:  May 12, 2008

                                Respectfully submitted,

                                BARRY J. PORTMAN
                                Federal Public Defender

                                /S/

                                ANGELA M. HANSEN
                                Assistant Federal Public Defender

---

need less authorization to restrict a user's access to electronic resources than they do to access electronic communications without consent.  Exhibit Q, Att. 2, II.C.